IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENISE M. MARSHALL,               )
                                   )
                    Plaintiff,     )
                                   )    Case No. 04 C 6395
        v.                         )
                                   )    Judge Mark Filip
BLUE CROSS BLUE SHIELD ASSOCIATION, )
PLAN ADMINISTRATOR LTD PROGRAM, and )
NATIONAL LONG TERM DISABILITY (LTD) )
PROGRAM, an employee welfare benefit Plan, )
                                   )
                    Defendants.    )

MEMORANDUM OPINION AND ORDER

Plaintiff, Denise M. Marshall ("Plaintiff" or "Marshall"), initiated this lawsuit against

Defendants, Blue Cross Blue Shield Association, Plan Administrator LTD Program

("Association" or "BCBSA"), and the National Long Term Disability (LTD) Program (the

"Program") (collectively "Defendants"),[1] under the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (D.E. 22 at 4 (case file for transferred Case No. 04-

945 (D.N.J. 2004), including original Complaint).)[2] Plaintiff alleges that Defendants wrongfully

---

[1] Plaintiff brings her complaint against "Blue Cross Blue Shield Association, Plan Administrator LTD Program, and the National Long Term Disability (LTD) Program," and refers to Defendants by those names in all her subsequent filings. (*See, e.g.*, D.E. 22 at 4; D.E. 79 at 1.) Defendants have noted that their correct names are "the Blue Cross and Blue Shield Association" and "the Non-Contributory National Long Term Disability Program." (*See, e.g.*, D.E. 6 at 1.) For purposes of maintaining consistency with Plaintiff's complaint and subsequent filings, and because the names as stated by Plaintiff have not led to any prejudicial confusion for Defendants, the Court refers to Defendants by the names used by Plaintiff in her Complaint and filings.

[2] The docket entries in this case are designated as "D.E. __."

and improperly denied her claim for continued Long Term Disability ("LTD") benefits in 1998.

Defendants originally moved for summary judgment (D.E. 68), and Plaintiff filed a cross-motion for summary judgment. (D.E. 78.) However, in Plaintiff's memorandum in support of her motion for summary judgment, Plaintiff argued in the alternative that, "Rule 52 of the Federal Rules of Civil Procedure allows the court to enter findings of fact and conclusions of law in plaintiff's favor." (D.E. 79 at 8.) After a preliminary review of the materials and briefs submitted by the parties, as well as caselaw from this circuit and from other federal circuits, the Court concluded that resolving the case pursuant to Rule 52 seemed like an appropriate procedural approach.

In that regard, the Court observed that both parties appeared to be asking the Court to determine the question of Plaintiff's eligibility for benefits effectively based on the case file reviewed by the Administrator and the proffered Program documents.[3] The Court also noted that neither party had pursued any discovery in the case nor had suggested that the party intended to present evidence outside of the evidence included in the comprehensive (*i.e.*, nearly 1400-page) Appendix.

Precedent from this circuit and from other federal circuits also appeared consistent with Plaintiff's proposal to proceed under a Rule 52 approach—which as precedent instructs, offers

---

[3] *See, e.g.*, Defendants' Amended Statement of Material Facts (D.E. 69 at 1, n.1) (relying for evidentiary support on the Appendix of Materials in Support of Defendants' Motion for Summary Judgment (D.E. 36) ("Appendix"), which contains: 1) the Declaration of Barbara Grant, Director of the Disability Program for the National Employee Benefits Administration ("NEBA") of the Association, which provides background facts about the Association, the Program, and documents related to the Program; 2) Ms. Marshall's Program claim file; and 3) documents related to the Program); Plaintiff's Rule 56.1 Statement (D.E. 77 at 1 & n.1) (citing exclusively to Defendants' Appendix and describing the Appendix as "a joint reference.").

potential gains in terms of costs-savings and efficiencies for the parties. *See, e.g., Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 741-42 (7th Cir. 2003) ("'Sometimes both parties move for summary judgment because they do not want to bear the expense of trial but instead want the trial judge to treat the record of the summary judgment proceeding as if it were the trial record. In effect, the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery.'") (quoting *May v. Evansville-Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1115 (7th Cir. 1986)); *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (deciding, in an ERISA case, that the applicable standard of review was the one found in Rule 52(a), where the parties stipulated to the facts that made up the administrative record, and "the procedure the parties followed . . . [was] more akin to a bench trial than to a summary judgment ruling."); *accord Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-1095 (9th Cir. 1999) (remanding ERISA benefits case to district court for a bench trial pursuant to Rule 52(a) on the record submitted to the plan administrator where there were disputed factual questions); *Akhtar v. Cont'l Cas. Co.*, No. 01 C 7109, 2002 WL 500544, at *1 (N.D. Ill. Apr. 1, 2002) (Kocoras, J.) (entering findings of fact and conclusions of law under Rule 52(a) in an ERISA case involving benefits eligibility); *LaBarge v. Life Ins. Co. of N. America*, No. 00 C 0512, 2001 WL 109527, at *1 (N.D. Ill. Feb. 6, 2001) (Holderman, J.) (same); *Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003) (Denlow, M.J.) (discussing the "problem of reviewing ERISA benefit claims on cross-motions for summary judgment" and strongly suggesting that "parties consider proceeding by means of a trial on the papers under Federal Rule of Civil Procedure 52(a).") (citing, *inter alia, Hess*, 274 F.3d at 461 and *Kearney*, 175 F.3d at 1094-95); *see also Allen v. United Mine Workers of*

3

*America 1979 Benefit Plan & Trust*, 726 F.2d 352, 353 (7th Cir. 1984) (discussing use of Rule 52 in an ERISA benefits dispute).

On July 26, 2006, the Court issued an order notifying the parties that it intended to resolve this case under Rule 52, as Plaintiff suggested. (D.E. 83.) The Court also notified the parties that the record that would be under consideration in its Rule 52 review would be the Appendix submitted by Defendants and relied on by Plaintiff. (*Id.*) The parties were expressly given the opportunity to object to such procedure and to indicate that they wanted the Court to apply Rule 56 and the summary judgment standard to the case. (*Id.*) Neither party objected and the Court has concluded, as Plaintiff suggested, that resolution without a trial, under Rule 52, is the most sensible manner to resolve the case. Therefore, pursuant to Fed. R. Civ. P. 52, the Court finds the evidence supports the position taken by Defendants and accordingly enters judgment in their favor.

I.    Background Events[4]

  A.    Background Facts About The Association And The Program

The Association is an Illinois not-for-profit corporation. (Grant Decl. ¶ 3.) The Association licenses the use of the Blue Cross and Blue Shield service marks and provides other

---

[4] Federal Rule of Civil Procedure 52 directs a Court to enter findings of facts and conclusions of law. To the extent any conclusion of fact herein in more properly characterized as a conclusion of law, it should be so construed, and vice-versa with respect to conclusions of law. *Accord, e.g., Quela v. Payco-General Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *1 (N.D. Ill. May 18, 2000) (Castillo, J.); *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 990 n.3 (N.D. Ill. 2005) (citing *Quela, supra*). The factual findings herein are based on the Court's review of the approximately 1400-page evidentiary Appendix proffered by the parties. The Court apologizes in advance to the parties for the length of the opinion, but the extensive factual record submitted, as well as the subject matter at issue (*i.e.*, whether Ms. Marshall should receive LTD benefits prospectively) prompted a longer opinion in an effort to be as thorough as possible.

services to separate Blue Cross and Blue Shield organizations throughout the United States. (*Id.*)[5] The Program is an employee welfare benefit program governed by ERISA. (*Id.* ¶ 4.) The Program provides LTD benefits to eligible employees of participating employers, including Ms. Marshall's former employer, Blue Cross and Blue Shield of Delaware, Inc. ("BCBSD"), one of the Association's Licensees. (*Id.* ¶ 6.)

The Program documents include, at a minimum, the Non-Contributory National LTD Program Document ("Program Statement") (App. at 001275-85) and the Program's Summary Program Description ("SPD"). (*Id.* at 001350-63.) Defendants and Plaintiff differ, however, on whether the complete Program documents include two other documents, the National LTD Trust Agreement ("Trust Agreement") (*id.* at 001313-49) and the National LTD Program Associations Plan ("Associations Agreement"). (*Id.* at 001307-12.)

Defendants and Plaintiff also disagree as to what amendments to the Program Statement may properly be applied to Plaintiff's claim. Concerning the issue of amendability, Section 15(a) of the Program Statement effective January 1, 1979 (the "1979 Program Statement") provides that, "[t]he Program may be amended at any time, in the manner provided by the Associations Agreement." (*Id.* at 001284.)

One of the definitions in the Program Statement that has been amended since Plaintiff first began receiving LTD benefits in 1984 is the definition of the term "Disabled," and specifically language in it that might bear on whether *de novo* or arbitrary and capricious review is appropriate in a judicial setting. In the 1979 Program Statement, Section 1(p) states that

---

[5] The organizations that hold an Association license are referred to in different documents as "Plans," "Licensees" and "Employers." For present purposes, the Court will refer to them as "Licensees." (*See* Grant Decl. ¶ 3.)

disabled "means that a Participant is, determined on the basis of medical evidence satisfactory to the Committee, wholly prevented, by reason of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the employer, at the time his disability occurred." (*Id.* at 001278.)[6] The Program Statement's definition of "Disabled" set forth in Section 1(p) was amended, effective March 11, 1998, "with respect to all Participants in the Program," to provide that "[t]he determination as to whether a Participant is 'Disabled' shall be based on medical evidence satisfactory to the Committee in its sole discretion" (the "1998 Amendment"). (*Id.* at 001302-03.) The 1998 Amendment states that its purpose was "to clarify the longstanding consistent interpretation" of the definition of "Disabled." (*Id.* at 001302.) This amendment was formally executed on July 2, 1998. (*Id.* at 001303.)

The Associations Agreement identifies the Program Administrator as the National Employee Benefits Committee ("NEBC" or "Administrator"), a standing committee of the Board of Directors of the Association. (*Id.* at 001309.) Specifically, the Associations Agreement between the Association and BCBSD states that the "administration of the program will be in the charge of the National Employee Benefits Committee." (*Id.*) In addition, the Associations Agreement states that the NEBC:

> shall have complete control of the administration of the Program with all powers necessary or convenient to enable it properly to carry out its duties in that respect. Without limiting the foregoing, the Committee has the power to construe the Program and to determine all questions that may arise thereunder. The Committee determines all questions relating to the eligibility of employees of the Plan, and

---

[6] Effective January 1, 1995, the definition of "Disabled" in the Program Statement was modified by an amendment ("1995 Amendment"), which provided that "[a]n occupation is considered comparable to that in which the Participant was engaged for the Employer if the earnings potential of the occupation is comparable to the employee's salary range at the time he became Disabled." (App. at 001289.)

the amount of benefits under the Program to which a Participating Employee is entitled . . . . The decision of the Committee upon all matters within the scope of its authority shall be final except as otherwise provided by law.

(*Id.* at 1310.) The NEBC has delegated the authority for the day-to-day operation of the Program to the National Employee Benefits Administration ("NEBA"), a department of the Association. (Grant Decl. ¶ 10.)

B.    Ms. Marshall's Initial Claim

Denise Marshall worked for BCBSD, one of the Association's Licensees. (*Id.* ¶ 2.) Ms. Marshall was hired by BCBSD on October 28, 1968, as a file clerk. (App. at 000015.) Her final position with BCBSD was as a customer service representative. (*Id.* at 000016.) In that position, Ms. Marshall was accountable for responding to telephone customer inquiries, regarding claims and service. (*Id.* at 000018-19.) In terms of physical demands, the customer service representative position required Ms. Marshall to be able to sit at her workstation and access resources in it. (*Id.* at 000493-94.) Her final monthly salary as a customer service representative, which was a BCBSD Grade 8 position, was $1693.00 per month. (*Id.* at 000016-18, 000881.) The monthly salary range for a Grade 8 employee as of June 6, 1984, when Ms. Marshall stopped working, was $1344.00 at the low end, $1746.00 at the midpoint, and $2016.00 at the high end. (*Id.* at 000891.)

As stated above, Ms. Marshall stopped working after sustaining a back injury in a car accident on June 6, 1984. (*Id.* at 000523, 000662.) Ms. Marshall was also involved in another car accident in June 1985. (*Id.* at 000526.) After receiving and exhausting short-term disability benefits through the Program, Marshall was approved for LTD benefits effective December 1, 1984. (*Id.* at 000002, 000662.) Ms. Marshall received LTD benefits from that time until June

7

30, 1998; continuation of Ms. Marshall's benefits was denied in 1986 and 1989, but was reinstated in both instances after she submitted additional medical evidence which the Administrator deemed satisfactory. (*Id.* at 000341, 000354, 000357, 000523-24, 000537, 000558-59, 000618-20.)

On July 9, 1990, Ms. Marshall had spinal surgery, performed by Dr. Bikash Bose, a neurosurgeon. (*Id.* at 000295, 000298.) Ms. Marshall did not believe that the surgery improved her condition and declined to do a second surgery recommended by Dr. Bose. (*Id.*)

On February 27, 1990, Dr. Lanny Edelsohn—a neurologist in Wilmington, Delaware, where Ms. Marshall resides—wrote a letter to Mr. Stephen Casarino, Esq., who had requested that Dr. Edelsohn examine Ms. Marshall. (*Id.* at 000220-22.)[7] Dr. Edelsohn's letter came subsequent to his February 1990 examination of Ms. Marshall; he had previously examined her on December 24, 1987. (*Id.* at 220) Dr. Edelsohn's findings included the following: "1) There are no clear abnormalities on Mrs. Marshall's examination. In addition, there are clear suggestions of degree of exaggeration.; 2) None of her laboratory tests to date suggest any clear disk herniation. Mild degree of disk bulging as recorded in the various reports are quite common in her age group and are, in my opinion, not responsible for her present complaints.; 3) . . . I cannot rule out the degree of myoligamentous injury to her neck and low back as a result of her accidents. However, it is unclear to me as to why she has not been able to return to her clerical

---

[7] In a letter submitted in 1997 to Administrator, Ms. Marshall's former counsel asserted that Mr. Casarino was defense counsel in the underlying case involving Ms. Marshall's 1984 automobile accident, and that Mr. Casarino had requested Dr. Edelsohn to examine Ms. Marshall "purely for a defense opinion." (App. at 001122.) Neither party has challenged the accuracy of this characterization of Dr. Edelsohn's report. However, nothing in the Court's result reached today turns on the conclusions reached by Dr. Edelsohn in 1990.

duties since I last saw her." (*Id.* at 000222.)

The Program claim file also reflects that on March 15, 1991, Dr. Ross Ufberg submitted a "narrative report" to a Mr. Kenneth M. Roseman after examining Ms. Marshall. (*Id.* at 000212-17.) (Mr. Roseman appears to have been one of several attorneys who have variously represented Ms. Marshall over the years.) Dr. Ufberg's opinion was that, based on the work restrictions he found necessary, along with the "flare-ups in her pain symptoms," Ms. Marshall was incapable of returning to any type of work. (*Id.* at 000216.) Dr. Ufberg reiterated his conclusion in a follow-up letter on March 28, 1991, stating that "[i]t is my opinion that Ms. Marshall is totally disabled from work for the rest of her life." (*Id.* at 000211.)

On December 17, 1991, Ms. Marshall's physician, Italo Monteleone, examined her and documented her subjective symptoms of, *inter alia*, low back pain, throbbing, and spasms. (*Id.* at 000281.) Dr. Monteleone's diagnosis was "cervical and lumbar herniated nucleus pulposus" and "post cervical laminectomy with fusion." (*Id.*) He also indicated "new findings of disc herniation at C4-5 with bulge C3-4." (*Id.*) Dr. Monteleone treated her with "cervical laminectomy with fusion," physical therapy, trigger blocks, Flexeril, and Maraflex. (*Id.*) At that time, Dr. Monteleone described Ms. Marshall's condition as "regressed" and described her as "house confined." (*Id.*) Furthermore, as of December 1991, Dr. Monteleone described Ms. Marshall as totally disabled from even a sedentary occupation and indicated that he did not expect a marked change in her condition in the future. (*Id.* at 000282.) Dr. Monteleone continued to be Ms. Marshall's doctor until he retired in 1995, when he was succeeded by Dr. Kamsheh. (*Id.* at 000737; *see also id.* at 000140.)

At various times during the claim review process for Ms. Marshall's claim, the

Administrator sought guidance regarding Marshall's medical situation and records from Dr. E. Richard Blonsky ("Dr. Blonsky"), a neurologist and specialist in pain management and rehabilitation, who has an active medical practice and is an Associate Professor at Northwestern University Medical School, and is the Program's Senior Medical Director. (*Id.* at 000767.) On March 4, 1996, Dr. Blonsky reviewed Ms. Marshall's file and noted that her physicians accepted her assertion of disability based entirely on her subjective complaints. (*Id.* at 000162.) Dr. Blonsky was unable to determine whether Marshall was disabled at that time and did not opine on that conclusion. (*Id.*)[8]

The Administrator, through Nurse Case Manager Donna Jones ("Nurse Jones"), arranged for Ms. Marshall to undergo a Functional Capacity Evaluation ("FCE") on June 21, 1996, with Lisa Shephard Bitton and Marcia Hadfield of the Work Fitness Program at Magee Rehabilitation Hospital in Philadelphia, Pennsylvania. (*Id.* at 000004, 000031-38, 000157.) The FCE report reflects that Ms. Bitton and Ms. Hadfield were aware that Ms. Marshall had been diagnosed with "C5-C6 herniation, fusion 1990, L5-S1 central disc herniation." (*Id.* at 000031.) The FCE listed the following in the "summary of assets" possessed by Ms. Marshall: "1. sedentary physical demand characteristics for lifting, carrying and pushing tasks (7 to 10 pounds); 2. Client is able to sit for 30 minutes." (*Id.*) The FCE listed the following in the "summary of limitations" that Ms. Marshall demonstrated: "1. Poor body mechanics throughout testing; 2. Low endurance with

---

[8] The Court notes that the second page of Dr. Blonsky's March 4, 1996 report is not included in the claim file. The Administrator's July 1997 Letter, which related the evidence reviewed in the decision to deny Ms. Marshall's benefits, states that in his March 1996 report, Dr. Blonsky also "recommended an Independent Medical Evaluation by a physiatrist and probably a Functional Capacity Evaluation." (App. at 000005.) In any event, the results of the FCE are what are important, not the exact path by which it came to be performed.

stairclimbing; 3. She did not exert her maximal voluntary effort for both upper extremities; 4. High pain levels throughout testing; 5. The client was unable to complete any standardized fine motor and tool manipulation tests due to pain; 6. Limitations in kneeling, bending and overhead reaching; 7. Inability to assume a squatting position; 8. Perceived level of capability is lower than her actual level tested as per the Spinal Function Sort Test." (*Id.* at 000031-32.) Ms. Bitton and Ms. Hadfield recommended that Ms. Marshall "[c]onsider comprehensive chronic pain program which will include, psychological counseling, biofeedback, physical therapy, occupational therapy and vocational services with the goal of returning to work." (*Id.* at 000032.)

During the FCE, Ms. Marshall underwent multiple tests of her functional capacity. Her poor performance on certain tests led to the nurses' evaluations that Ms. Marshall was not exerting maximum effort during the examination and the evaluation of Dr. Blonsky that Ms. Marshall was not attempting to perform to the best of her abilities. For example, one test, the Bennett Hand Tool Dexterity Test, evaluated the ability of the subject to manipulate hand tools and various sizes of nuts, bolts and washers; the test results indicated that Ms. Marshall was unable to exert enough force to unscrew the screws. (*Id.* at 000034.) Another test performed was the Minnesota Rate of Manipulation Test, which tested her ability to pick up and place a double checker size object with speed and accuracy. (*Id.*) Ms. Marshall performed below the 1st percentile in this test. (*Id.*) In the Crawford's Small Parts Dexterity Test, Ms. Marshall's results indicated that she did not complete the test and "had significant difficulty threading the screws. She often dropped it and [allegedly] did not understand the mechanism for screwing them in." (*Id.* at 000034-35.) On August 27, 1996, Dr. Blonsky reviewed the results of the FCE and noted that Ms. Marshall displayed "obvious self-limiting behavior" and "symptom exaggeration" in her

11

inability to perform fine manipulation tasks. (*Id.* at 000141.) Dr. Blonsky then recommended

that Ms. Marshall be found disabled for an additional six months so that she could complete a

"very low-level" work hardening[9] and endurance building program for sedentary activities, and

so that she eventually she could return to work. (*Id.*)

On February 21, 1997, the Administrator determined that Ms. Marshall had failed to

establish the propriety of continued disability status, and therefore temporarily suspended

Marshall's LTD benefits, effective March 1, 1997, for lack of medical evidence; the

Administrator had previously informed Ms. Marshall that her benefits would cease if she did not

provide certain requested records. (*Id.* at 000115.) Specifically, the Administrator noted in the

February 21, 1997 letter that it had not received copies of clinical progress notes from Dr. Walid

Kamsheh, a neurologist and Marshall's primary treating physician, or progress notes from

Marshall's work hardening program. (*Id.*) The Administrator requested submission of those

records by March 31, 1997, and after receipt of some of the requested records, the Administrator

reinstated benefits in a letter dated April 7, 1997, retroactive to March 1, 1997 and through May

31, 1997, pending submission of additional medical evidence. (*Id.* at 000091-92, 000115.)

On June 4, 1997, the Administrator received additional records from Dr. Kamsheh,

including a series of detailed treatment notes and records from consultations with other

physicians. (*See, e.g., id.* at 000054-61, 000080, 000139-40.) In his October 14, 1996 treatment

note, Dr. Kamsheh noted that had succeeded Dr. Monteleone as Ms. Marshall's physician after

his retirement. (*Id.* at 000140.) In the treatment note, Dr. Kamsheh stated that he had not seen

---

[9] A "work hardening" program appears from the record to be a program where someone
is given physical therapy and related occupational therapy treatments and opportunities so they
are able to most easily and effectively transition back into employment.

Ms. Marshall in ten months, because although "she was supposed to be followed on a regular basis by me," "[s]he had not shown since January 1996." (*Id.*) Dr. Kamsheh noted that Ms. Marshall had no weakness in her upper or lower extremities, that she was able to walk rather normally, and that there were no abnormalities in the neurological exam that he performed. (*Id.*; *see also id.* (stating that Ms. Marshall "was able to stand up on her tiptoes and heels and walk rather normal[ly]").) He stated that "[o]verall, this patient does indeed have a variety of symptoms, some of which are not related to her cervical nor her lumbar spines." (*Id.*) (These problems included, for example, an ongoing moderate obesity problem that appears to have exacerbated somewhat over time.) Dr. Kamsheh concluded the October 14, 1996 note by saying that he encouraged Marshall to increase her physical activity, and that he was not sure why she was unable to work at that point. (*Id.*; *see also id.* at 000055 (December 30, 1995 treatment note of Dr. Kamsheh (reflecting that he had advised Ms. Marshall "that there is no reason for her not to be working at this point").)

On February 3, 1997, Ms. Marshall came in to see Dr. Kamsheh "because of severe neck pain, back pain, left leg numbness." (*Id.* at 000055.) Dr. Kamsheh again stated in his treatment note that Ms. Marshall had chronic back pain and neck and shoulder pain, and had also had an objective moment of numbness, but no weakness, and he recommended that she undergo an MRI. (*Id.*) Marshall underwent a MRI of the cervical spine on February 5, 1997, the results of which stated "[s]tatus post fusion from C5 to C7 with good alignment of the vertebral body. Small herniation is noted at C3-C4 with spondylosis and bulge at C4-C5." (*Id.* at 000061.) Ms. Marshall also underwent an MRI of the lumbar spine on April 30, 1997, the impression of which was "[d]isc dessication and central disc herniation at L5-S1, which is unchanged from previous

study of 2/11/87. No new disc herniations are identified. There is no significant spinal stenosis or compression of neural elements." (*Id.* at 000060.)

On February 17, 1997, Dr. Kamsheh noted that Ms. Marshall was unwilling to undergo physical therapy or have a surgical opinion, that there was no change from a previous and unremarkable neurological exam, and that she had good muscle strength. (*Id.* at 000056.) Dr. Kamsheh noted that Ms. Marshall would be continued on over-the-counter pain medication and would be sent officially for physical therapy. (*Id.*)

On March 17, 1997, Dr. Kamsheh noted that Marshall complained of pain everywhere and that she was not able to tolerate a work hardening program. (*Id.*) In addition, in this treatment note, Dr. Kamsheh noted that she had chronic back pain, neck and shoulder pain and "Fibromyalgia like syndrome." (*Id.*) Dr. Kamsheh noted that Ms. Marshall would be continued on physical therapy and on Flexeril. (*Id.*)

On April 8, 1997, Dr. Kamsheh—*i.e.*, Ms. Marshall's treating physician—told Nurse Jones, and confirmed via fax at Nurse Jones's request for a response in writing, that Ms. Marshall could work, with the only restriction being a requirement that she take a 15-minute break every two to three hours. (*Id.* at 000077, 000085.)

On April 21, 1997, Dr. Kamsheh again saw Ms. Marshall. He stated that her "[r]ange of motion in the upper and lower extremities appeared to be full. Slight restriction to the neck and back. No weakness in one side or the other." (*Id.* at 000057.) He noted that Ms. Marshall reported falling without any reason, and noted her claims that she was not able to tolerate physical therapy. (*Id.* ("Every time we tried medical and physical treatment patient stated she is not able to do [it] and so there is no help.").) Dr. Kamsheh referred Ms. Marshall to Dr. Bikash

Bose. (*Id.*)

Dr. Bose saw Ms. Marshall on May 13, 1997, and he examined her and reviewed the MRIs of her cervical and lumbar spine. (*Id.* at 000058-59.) In view of her symptoms, Dr. Bose offered Marshall a choice of continued conservative care, or a myelogram and possible surgery, and she opted for the former option. (*Id.*) Nurse Jones's notes from May 19, 1997 indicate that Ms. Marshall told her in a phone conversation that Dr. Bose indicated that "she will need surgery 'but he will not do it until the pain is unbearable to me.'" (*Id.* at 000067.) Dr. Kamsheh indicated in a May 19, 1997 treatment note that Dr. Bose recommended a "myelogram of the LS spine and possibly surgical intervention. Myelogram has not been scheduled so far." (*Id.* at 000057.) Dr. Kamsheh advised Ms. Marshall to follow Dr. Bose's recommendations to get a myelogram. (*Id.*)

The Administrator also obtained and reviewed notes from Ms. Marshall's physical therapy sessions with Karen Widdoes of Rehabilitation Consultants, Inc. in Wilmington. (*Id.* at 000062-66.) The notes indicate that Ms. Marshall attended a physical therapy session on January 27, 1997. (*Id.* at 000072-73.) Ms. Marshall apparently did not attend physical therapy again until March 3, 1997, when she was directed to attend by Dr. Kamsheh. (*Id.* at 000064.) Ms. Widdoes noted on March 17, 1997 that Ms. Marshall was working on an exercise program (*id.* at 000064), but in her April 14, 1997 report, Widdoes stated that physical therapy had come to a standstill because Ms. Marshall was unable to move to a higher level of exercise without reporting an increase in pain. (*Id.* at 000062-63.) Ms. Widdoes further stated that ultrasound, traction and stretching exercises prompted increases in Ms. Marshall's reported symptoms. (*Id.* at 000062.)

Ms. Widdoes also noted that Ms. Marshall had gone to the emergency room on March 20, 1997 (*id.*); this visit to the emergency room was, according to Ms. Marshall, attributable to her March 19, 1997 physical therapy session, and was motivated because she was developing chest pains and numbness and increased "tightening." (*Id.* at 000107.) In discussing her experience with therapy, Ms. Marshall explained that "it's impossible for those muscles to get back." (*Id.*) Ms. Marshall also attended a work hardening program on February 24-27, 1997, but was unable to continue the program because, she explained, "it put me in the bed." (*Id.* at 000099; *see also id.* at 000003 (similar).)

Dr. Blonsky reviewed Ms. Marshall's file on April 2, 1997, and noted that: (1) the results from Ms. Marshall's February 5, 1997 MRI were unchanged from an MRI she underwent on February 8, 1991 (*see id.* at 000103); (2) the EMG results obtained from her physicians did not show any impairment of functional ability; (3) her position that pain prevented her from work hardening or physical therapy "makes no sense." (*Id.* at 000094.) Dr. Blonsky further concluded that "[s]howing up for a day" of a physical therapy program "and not thereafter, is not compliance." (*Id.*) In the report, Dr. Blonsky further noted that "[h]er neurologist sees no reason she can't work" and he asserted that Ms. Marshall was "manipulative and probably malingering." (*Id.*) Dr. Blonsky recommended a sedentary Transferable Skills Analysis ("TSA") without any further work hardening. (*Id.*)

On April 16, 1997, the Administrator requested that Ellis and Associations perform a TSA, which sought to identify appropriate positions for Ms. Marshall, given her medical situation. (*Id.* at 000075, 000082-83.) The TSA report issued on April 28, 1997. (*Id.* at 000083.) The TSA was performed after reviewing Ms. Marshall's medical records and the

results of her FCE and Dr. Kamsheh's April 15, 1997 work restrictions. (*Id.* at 000082-83.) The TSA identified at least four job titles, with D.O.T. job codes, that represented Ms. Marshall's past work skills and past work history, and that were also sedentary occupations. (*Id.* at 000082.)[10]

Dr. Blonsky viewed Ms. Marshall's medical records again on June 4, 1997 and wrote that her pain behaviors "exceed anything that should reasonably be expected based on objective findings" and that there was "no change in her cervical or lumbar spine over the past 10 years." (*Id.* at 000052.) Dr. Blonsky continued "[s]he no more needs surgery, or a surgical workup than I do. This [patient] has parlayed her trivial injuries of 12 + 13 years ago into a lifestyle of compensated inactivity. The notion that she could not understand how to screw something into a board during the FCE is ludicrous." (*Id.* at 000052-53.) Ultimately, Dr. Blonsky recommended surveillance and/or a TSA to confirm his conclusion that Ms. Marshall was not disabled within the meaning of the Program documents. (*Id.*)

Based on a review of Ms. Marshall's medical records, the opinion of Dr. Blonsky, and the results of the FCE and TSA, the Medical Review Committee ("MRC") in a letter dated July 25, 1997 ("July 1997 Letter") found that Ms. Marshall did not establish her eligibility for continued disability status. (*Id.* at 000002-09.) The July 1997 Letter further specifically noted that:

- During the June 1996 FCE, Marshall did not put forth maximal effort and her scores on some tests were far lower that her claimed condition could

---

[10] The Court notes that the third page of the TSA report (which would appear to be App. at 000081) is not contained in the record. Any information contained on that page is therefore not included in the Court's analysis.

possibly cause, leading the MRC to consider the possibility that the test

results were invalid because Ms. Marshall had attempted to manipulate the

outcome;

- Dr. Kamsheh, Ms. Marshall's own selected treating physician at the time,
  found no reason why Ms. Marshall was not able to work, both at an
  October 14, 1996 examination, and then after reviewing Ms. Marshall's
  EMG study results on December 30, 1996; further, Dr. Kamsheh
  concluded on April 16, 1997 that Marshall could work with the sole
  restriction that she required a 15-minute break every two to three hours;

- Ms. Marshall twice discontinued physical therapy in early 1997;

- Dr. Blonsky had noted on March 4, 1996 that Ms. Marshall's doctors had
  previously validated her disability solely based on her subjective
  complaints;

- Dr. Blonsky had noted on August 21, 1996 that Ms. Marshall had self-
  limiting behaviors and should engage in a work hardening program;

- Dr. Blonsky had noted on April 2, 1997 that her test results were normal
  and she had refused to comply with a treatment program; and

- Dr. Blonsky had noted on June 4, 1997 that Ms. Marshall had pain
  behaviors that exceeded anything that could be expected from the
  objective findings, that her condition had not worsened in ten years, and
  that she was able to function at a sedentary job.

(*Id.*) At the close of the letter, the MRC described the Claims Appeal Procedure and specified an

appeal deadline of October 28, 1997. (*Id.* at 000007-08.) As an aid to Ms. Marshall in appealing the denial of benefits, the July 1997 Letter suggests sending additional "test and x-ray results, physician office notes, hospital or physical therapy reports, or medical evaluations and consultations." (*Id.* at 000007.)

      C.     Ms. Marshall's First Appeal

      On August 23, 1997 and October 22, 1997, Ms. Marshall, through her then-attorney Mr. Goll, appealed the denial of her claim for benefits and requested an extension of time to submit additional evidence. (*Id.* at 001120-25, 001127.) A myelogram and CAT scans were performed on Ms. Marshall by Dr. Bose's office in September 1997, and her admission diagnosis was cervical radiculopathy. (*Id.* at 000795, 001120.) Pursuant to the findings of the myelogram, Ms. Marshall underwent a back operation on October 28, 1997 to complete a discectomy and fusion ("October 1997 Surgery"). (*Id.* at 000752-53, 001092, 001095, 001120.) The surgery was described as a "two level anterior cervical discectomy, fusion with instrumentation;" the discs involved were the C3-4 and C4-5 discs. (*Id.* at 000892; *see also id.* at 000795.) In a notation made on May 1, 1998, Dr. Bose, Ms. Marshall's surgeon, recommended that Ms. Marshall not work until November 1998—*i.e.*, until 12 months after surgery. (*Id.* at 000742-43.)

      The Administrator granted an extension through January 5, 1998 for Ms. Marshall to submit medical records, and the Administrator listed the medical evidence needed by the Claims Appeal Committee ("CAC"). (*Id.* at 001119.) On January 5, 1998, Ms. Marshall submitted certain medical evidence as part of her appeal. (*Id.* at 001090-91.) The CAC acknowledged receipt of the evidence and set a deadline of March 6, 1998 to reach its decision on Ms. Marshall's appeal. (*Id.* at 001090.)

Dr. Blonsky reviewed Ms. Marshall's medical records on January 21, 1998. (*Id.* at 001087.) Although he opined that the October 1997 Surgery was inappropriate in light of the medical evidence, he recommended that she receive six months of disability benefits to allow her to heal from the operation and to participate in rehabilitation. (*Id.*)

In a letter dated January 29, 1998, the CAC, through Barbara Grant, Assistant Secretary of the NEBC, approved disability benefits for Ms. Marshall from September 1, 1997 through April 30, 1998. (*Id.* at 001078-80.) The CAC stressed in this letter that "continued benefits are conditioned on Ms. Marshall's participation in the prescribed rehabilitation (therapy) process, and her maximal effort in pursuing a return to wellness." (*Id.* at 001079.) The CAC's letter also responded to the issues raised by Ms. Marshall in her October 22, 1997 appeal letter; the CAC explained, among other things, how the TSA was performed, how the MRC evaluated subjective complaints of pain, and how the MRC viewed medical records from Dr. Kamsheh and Ms. Marshall's previous treating physicians. (*Id.* at 001078-79.) Finally, the CAC enclosed a list of the medical evidence and records that Ms. Marshall would need to submit by April 9, 1998 to receive benefits beyond April 30, 1998. (*Id.* at 001081.)

In a letter dated April 17, 1998, the MRC informed Ms. Marshall that it had not received the requested medical documentation and that her benefits would therefore be suspended effective May 1, 1998; the MRC set a new deadline of May 8, 1998 for submission of medical records. (*Id.* at 001027-28.) Ms. Marshall then submitted medical records in a letter dated April 20, 1998. (*Id.* at 001029-31.)

On June 15, 1998, the MRC stated that it was unable to make a further decision on Ms. Marshall's claim because Dr. Bose (one of her doctors) had not responded to attempts to contact

him and that the MRC would need a 60-day extension to continue to attempt to reach Dr. Bose and to evaluate the relevant information. (*Id.* at 001003-04.) The MRC set a new deadline of August 29, 1998 to make a decision on Ms. Marshall's claim. (*Id.*) Apparently, after the MRC's statement issued on June 15, 1998, Dr. Bose faxed a letter to the Administrator, explaining that Ms. Marshall had had a slow recovery from the October 1997 Surgery, and that she was having symptoms related to spinal cord dysfunction. (*Id.* at 000892.) Dr. Bose indicated that Ms. Marshall needed twelve months before being released for unrestricted work. (*Id.*) In this letter, Dr. Bose—again, one of Ms. Marshall's treating doctors—released Marshall for sedentary work as of July 1, 1998. (*Id.*)

The MRC also evaluated office examination notes from Dr. Bose from 1998. (*Id.* at 000745-49.) On January 23, 1998, Dr. Bose stated in his notes that Ms. Marshall felt that she was doing better, that she had some numbness in her index finger and thumb on her left hand, that x-rays revealed solid fusion and that Marshall could start physical therapy. (*Id.* at 000749.) On March 20, 1998, Dr. Bose noted that Marshall's fusion was progressing well and that her x-rays showed satisfactory alignment, and overall that "she seems to be doing well." (*Id.* at 000748.) On June 5, 1998, Dr. Bose noted that her fusion was going well and her MRI results were normal. (*Id.* at 000747.) Ms. Marshall, however, indicated that she was experiencing a burning sensation on her right side, and Dr. Bose stated that if there was no improvement, she "may need a spinal tap." (*Id.*) Dr. Bose also suggested that Ms. Marshall be started on Neurotonin. (*Id.*)

On July 20, 1998, Dr. Bose noted good healing in Marshall's spine and that she had some aches and pains, including the continued burning sensation on her right side and weakness and

21

stiffness on her left side, but Dr. Bose indicated that she should gradually resume all activities. (*Id.* at 000746.) Specifically, the office notes of this examination state as follows: "I informed her that some of the sensations and aches and pains that she is having will be a residual part of her symptoms. It does not look like she will make a 100% recovery. However, there is still time for healing. Return to office in three months. *Gradually resume all activities.* Follow up x-rays in three months." (*Id.* (emphasis added).)

The Administrator obtained and reviewed the therapy progress notes from Ms. Marshall's recovery from her October 1997 Surgery. (*Id.* at 000799-818, 001016-18, 001034-68.) Ms. Marshall appears to have been discharged from the hospital around November 13, 1997. (*Id.* at 000800.) She started physical and occupational therapy with a visiting nurse service on November 14, 1997. (*Id.*) The December 3 and December 11, 1997 discharge notes reflected that Ms. Marshall had met all of the in-house therapy goals that had been set for her, and she was being transferred to outpatient therapy. (*Id.* at 000806-07, 000817-18.)

On December 16, 1997, Ms. Marshall began attending occupational therapy at the Medical Center of Delaware's Occupational Therapy Department (the "OTD"), and Ms. Marshall proceeded to attend multiple occupational therapy sessions. (*Id.* at 001034-50.) The March 18, 1998 Outpatient Progress Note from the OTD indicated that Ms. Marshall had made significant progress in range of motion and strength gains, she was attempting more functional activities, she had resumed driving, she had become more active in her church, her pain had decreased, and therefore, no further occupational therapy was needed. (*Id.* at 001016-18.) Nurse Jones also spoke with Karen Opitz of the OTD on May 19, 1998; Ms. Opitz confirmed that Ms. Marshall showed great improvement in therapy with decreased pain and increased range of motion,

22

strength, and independence in average daily living tasks. (*Id.* at 001026.)

On May 27, 1998, Dr. Blonsky reviewed Ms. Marshall's medical records and concluded

that she was not disabled. (*Id.* at 001010.) In so doing, Dr. Blonsky noted that "[t]here . . . [was]

no legitimate reason she could not RTW [return to work] after 3 months [of her October 1997

Surgery], certainly [within the] 6 months [unintelligible word] we have allowed." (*Id.*) Dr.

Blonsky also noted that Ms. Marshall's range of motion was "pretty good" and her neurological

exam results were excellent, and any Brown-Sequard syndrome she might be experiencing was

not disabling.[11] (*Id.*)

On July 21, 1998, the MRC determined that Ms. Marshall failed to establish an

entitlement to LTD benefits past June 30, 1998 (the "July 1998 Letter"). (*Id.* at 000992-96.) In

---

[11] The claim file includes several pages of information relating to Brown-Sequard syndrome–it appears that Ms. Marshall's current counsel, Mr. John M. Stull, submitted these "information sheets" to the Administrator on June 21, 2001. (App. at 000821 (August 9, 2001 letter from Ms. Grant to Mr. Stull, acknowledging receipt of materials, including the Brown-Sequard information sheets); *id.* at 000744; *id.* at 000770-74 (describing Brown-Sequard syndrome as an uncommon spinal motor disease, with only five hundred reported cases to date).) In her statement of facts, Plaintiff states that "[p]resumably Dr. Blonsky was aware of a profile of a Brown-Sequard medical condition because the Administrative Record . . . presents a list of tests and analyses by which to reach an opinion on the verifiability of the condition." (D.E. 77 ¶ 57.) The Court will assume the truth of Plaintiff's assertion; however, as shown above, the Brown-Sequard materials do not appear to have been submitted by Plaintiff until 2001. The first time a reference to Brown-Sequard syndrome appears in the notes of one of Ms. Marshall's treating physicians is in Dr. William Sommers's March 25, 1998 notes. (App. at 000756-57.) The impact of any evidence of Brown-Sequard syndrome is discussed further below in the analysis section; although the bottom-line is that, to the extent Ms. Marshall has been shown to (or can be assumed to) experience this uncommon syndrome, it has not been shown to render her "disabled" within the meaning of LTD eligibility. Many people battle various diseases and medical conditions—ranging from depression, to Crohn's Disease, to kidney dysfunction, and many other diseases—without becoming "disabled" in the sense that they can no longer productively contribute through their work and employment. Put differently, Ms. Marshall has not shown, in the context of the overall record, that any Brown-Sequard syndrome renders her disabled on a long-term and prospective basis.

so doing, the MRC recited relevant Program provisions, discussed the case history and the documents it reviewed as part of the appeal, and noted the following:

- The records submitted from the OTD revealed that Ms. Marshall was recovering well in March 1998, with increased strength and range of motion and reduced pain, and was completing occupational therapy sessions, attending community events, and driving independently;

- Ms. Marshall deliberately omitted evidence coming from Dr. Bose and the OTD that was unfavorable to her claim; more specifically, the July 1998 Letter stated that "both Dr. Bose's office and the Therapy Department at the Medical Center of Delaware advised the Nurse Case Manager that you had already been given the information which she [Nurse Jones] requested. This raises the possibility that you misrepresented your claim by selectively omitting evidence. The evidence seems unfavorable to your claim of disability, and omitting it suggests an attempt to misrepresent the evidence." (*Id.* at 000994.)

- Dr. Bose's notes showed that Ms. Marshall was healing well in early 1998;

- Dr. Bose stated on June 16, 1998 that Ms. Marshall could start sedentary work on July 1, 1998; and

- Dr. Blonsky found that there was no reason preventing Ms. Marshall from returning to work three months after surgery and that her range of motion and neurological exam results were both good.

(*Id.*) At the close of the July 1998 Letter, the MRC described the Claims Appeal procedure and

specified an appeal deadline of October 22, 1998. (*Id.* at 000995.)

D.      Marshall's Second Appeal

On October 21, 1998, Ms. Marshall's counsel faxed a letter appealing the MRC's decision, along with a Disability Certificate from Dr. Ross Ufberg, who had become Ms. Marshall's primary treating physician as of October 13, 1998. (*Id.* at 000972-74.) The record contains notes from Nurse Jones on November 19, 1998, indicating that in a telephone call, Mr. Goll, Ms. Marshall's attorney at the time, described Dr. Ufberg as "provid[ing] [treatment] to a lot of plaintiffs in our local situation" and having a "bias towards plaintiffs," and that Mr. Goll did not encourage Ms. Marshall to see Dr. Ufberg and that he did not know how she came to start seeing him. (*Id.* at 000955.) Mr. Goll, who was then Ms. Marshall's attorney, encouraged the CAC to call Dr. Ufberg to seek answers about his views, which he thought was "entirely fair," however Mr. Goll indicated that Dr. Ufberg would "probably not answer the questions." (*Id.*)

The CAC acknowledged the letter on October 28, 1998 and set a December 21 deadline to reach a decision on her appeal. (*Id.* at 000970.) Then, in a letter dated December 18, 1998, the CAC confirmed its telephone conferences with Ms. Marshall of the previous two days and extended her deadline to submit additional medical evidence to February 5, 1999. (*Id.* at 000933.) The CAC also noted that it had received medical evidence from Dr. William Sommers of Wilmington Neurology on the previous day and it specified the medical evidence that Ms. Marshall needed to submit as part of her appeal. (*Id.* at 000933-34.) Finally, the CAC informed Ms. Marshall's attorney that it would reach a decision on her appeal by April 6, 1999. (*Id.* at 000934.) Ms. Marshall's counsel submitted additional medical evidence on January 30, 1999. (*Id.* at 000908.)

25

In addition to reviewing previously described notes and records from Dr. Bose, the CAC's review considered an October 19, 1998 treatment note from Dr. Bose, where he stated that Ms. Marshall's x-rays revealed solid fusion and that she should get a final x-ray in 12 months. (*Id.* at 000745.) Specifically, Dr. Bose noted that Ms. Marshall "[f]eels she is doing well. From neck down only on right side is numb, clear down to her foot and also says right foot feels like it is on fire." (*Id.*) Dr. Bose observed "some signs of hemisensory spinal cord problems." (*Id.*) Dr. Bose also stated that "Dr. Ufburg [sic] is treating her with Neurotonin. Advised her to continue with the medications." (*Id.*) Dr. Bose noted that she was ambulating and moving her four extremities quite well. (*Id.*)

The CAC also reviewed notes from Dr. William Sommers. (*Id.* at 000755-57, 000912-13.) Dr. Sommers is a neurologist and became one of Ms. Marshall's treating physicians after a referral from Dr. Bose. (*Id.* at 000757.) Dr. Sommers's March 25, 1998 progress notes reflect the clinical impression that Ms. Marshall was experiencing left upper extremity weakness "in combination with right body sensory disturbance." (*Id.* at 000756.) Dr. Sommers stated that he believed that this pattern of sensation was suggestive of a cervical spinal cord syndrome, specifically Brown-Sequard syndrome. (*Id.*) Dr. Sommers recommended that Ms. Marshall have an MRI scan to check her cervical spinal cord. (*Id.* at 000755.) Dr. Sommers examined Ms. Marshall again on December 18, 1998. (*Id.* at 000912.) Dr. Sommers noted that Ms. Marshall was still complaining of left upper extremity weakness and right-sided hemisensory disturbance. (*Id.*) Dr. Sommers noted that Neurotonin and Amitriptyline "have relieved burning discomfort to an extent." (*Id.*) Dr. Sommers planned to re-evaluate Ms. Marshall upon completion of an EMG and nerve conduction study. (*Id.*)

In addition, the CAC reviewed records from Dr. Ross Ufberg. (*Id.* at 000921-28, 000954.) Dr. Ufberg's September 14 and October 13, 1998, and January 13, 1999 treatment notes describe Ms. Marshall as being in "moderate distress." (*Id.* at 000921, 000923, 000926.) Dr. Ufberg's reports relate the surgeries and procedures that have been performed on Ms. Marshall. (*Id.* at 000921, 000923, 000926-27.) They also document Ms. Marshall's symptoms as including burning over her right leg and arm and decreased sensation, or an uncomfortable feeling, over her right trunk. (*Id.*) Ms. Marshall did not describe any weakness on her right side, but she did describe balance problems with her right leg, and difficulties with dropping things from her right hand. (*Id.* at 000926.) Her range of motion was also documented as being limited. (*Id.* at 000921, 000923, 000926-27.) Dr. Ufberg concluded that Ms. Marshall had a number of back ailments, including left cervical myelopathy, a herniated disc at L5-S1, cervical, thoracic, and lumbosacral strain and fibromyalgia, and that she should "continue total disability." (*Id.* at 000922, 000923, 000927.)[12]

---

[12] As discussed elsewhere, the Court finds that there are substantial credibility issues with Dr. Ufberg. To begin, Plaintiff's own counsel (as of 1998) questioned Dr. Ufberg's impartiality (App. at 000955), when relating that Ms. Marshall apparently had sought out Dr. Ufberg's diagnosis and treatment on her own and without notifying or discussing the matter with her counsel. (*Id.*) (The Court notes that Plaintiff has tendered no objection to this evidence or otherwise suggested that it is not to be credited at face value.) Further, even if one entirely discounts the cautionary admonition of Plaintiff's own counsel at the time, Dr. Ufberg's statements about Ms. Marshall suggest, as the Defendants' medical consultants noted, a bias towards a disability finding. For example, in March 1991, Dr. Ufberg was prepared to declare Ms. Marshall "totally disabled from work for the rest of her life." (*Id.* at 000196.) However, at least two of Ms. Marshall's doctors—Dr. Kamsheh, her principal treating physician at the relevant time, and Dr. Bose, her surgeon—subsequently found that she was capable of returning to sedentary work. (*Id.* at 000085, 000892.) Dr. Ufberg's willingness to speak categorically about lifelong disability, when Plaintiff's own main treaters subsequently declared her fit to return to work, at a minimum raises concerns about closed-mindedness and preconceptions with respect to Dr. Ufberg. By way of contrast, Dr. Blonsky, the defense medical consultant, about whom Ms. Marshall complains of bias, was, at least at times, substantially more cautious and

Dr. Ufberg noted that Ms. Marshall was taking medications for her pain, including Advil or Tylenol during the day for pain and Flexeril (a muscle relaxant) for stiffness; in addition Ms. Marshall took either Darvocet, Elavil or Pamelor for pain at night, as well as taking Neurotonin. *(See id.* at 000921, 000923, 000926.)* In describing Ms. Marshall's limitations, Dr. Ufberg stated in a November 23, 1998 letter to the Administrator that, in an eight hour day, "she would only be capable of sitting three to four hours at time [sic], or standing approximately one hour to an hour and a half." *(Id.* at 000954.) Dr. Ufberg also noted that Ms. Marshall was totally restricted from bending and had restrictions related to how much she could lift and to reaching over her head. *(Id.)* Dr. Ufberg stated that "[w]ith these restrictions, in addition [sic] problems with severe flare-ups of her pain symptoms, it is my opinion that she is incapable of returning to any form of work." *(Id.)*

The CAC also reviewed the results of a January 12, 1999 EMG. *(Id.* at 000883-84.) Dr. Sommers had requested the EMG in his December 18, 1998 progress note. *(Id.* at 000912.) The conclusions of the EMG were as follows: "1. No EMG evidence of active ongoing denervation in the upper extremities. Mild chronic changes of denervation/reinnervation likely reflect a mild degree of old damage to the C6 or C5 cervical rootlet(s) or much less likely to the upper trunk of the brachial plexus.; 2. Mild right median neuropathy at the level of the wrist (carpal tunnel syndrome) with preserved APB and motor and sensory amplitudes. This is of questionable clinical significance.; 3. Normal EMG/nerve conduction study, right lower extremity." *(Id.* at 000884.)

---

open-minded. *(See, e.g., id.* at 000162 (reserving judgment on disability question concerning Ms. Marshall pending receipt of further evidence and information).)

Dr. Blonsky reviewed Ms. Marshall's medical records twice during this appeal stage. (*Id.* at 000905, 000952.) On December 2, 1998, he determined that she was not disabled; Dr. Blonsky stated that "Dr. Ufberg lists several diagnoses including fibromyalgia, for which there is no basis. He merely reiterates various procedures which have been done, as if this alone should be enough to warrant her 'disability.' The [claimant's] strength is excellent. Sensory changes are not an issue in her work. She is responding to Neurotonin. Dr. Bose released her ([*i.e.*, Plaintiff's] treating MD [to work]). She is not disabled." (*Id.* at 000952.)

Dr. Blonsky reviewed Marshall's medical records again on February 10, 1999 after the receipt of Dr. Ufberg's notes, and he noted that Ms. Marshall had responded to Neurotonin. (*Id.* at 000905.) He further noted that her alleged instability in walking or standing would not affect her in a sedentary position. (*Id.*) Dr. Blonsky concluded that no further investigation was required to determine that disability was no longer shown. (*Id.*)

The Administrator also requested a labor market survey from Ellis and Associates to determine whether there were available jobs in Ms. Marshall's area that had appropriate wage and skill-set requirements for her. (*Id.* at 00881, 000893-97, 000904.) The Administrator provided Ellis and Associates with salary information for Ms. Marshall of $1693 per month. (*Id.* at 000881.) In their March 18, 1999 report, Ellis and Associates stated that they had conducted a survey between March 1 and March 15, 1999 after reviewing Marshall's medical records. (*Id.* at 000893.) Specifically, the labor market survey had the goal of "identify[ing] sedentary positions carrying wages above $6.00 per hour. Mainly, we targeted occupations for which the subject possesses transferable work skills according to the Transferable Work Skills Analysis conducted earlier." (*Id.*) The report indicated that eight sedentary positions were found, with an hourly

wage rate in the $6 to $12 per hour range. (*Id.* at 000894-97.)

In a letter dated April 2, 1999 (the "April 1999 Letter"), the CAC denied Ms. Marshall's appeal for LTD benefits. (*Id.* at 000758-64.) In that letter, the CAC recited relevant program provisions, discussed the case history and the documents it reviewed as part of the appeal, and then noted the following:

- Dr. Blonsky had reviewed Marshall's medical records on two occasions during the appeal review process and had found that there was no basis for several of Dr. Ufberg's diagnoses; that Marshall had been released to return to work by Dr. Bose, her surgeon; that she had responded to medication; that her condition did not prevent her from performing sedentary work tasks; and that records from Drs. Sommers and Bose documented Marshall's recovery and ability to function;

- Ms. Marshall's medical records did not show any evidence of motivation on her part to return to work;

- The records from Drs. Sommers and Bose, and Marshall's March 1998 physical therapy notes, all showed that Ms. Marshall was able to work and had recovered from her October 1997 Surgery;

- Dr. Ufberg did not offer a rationale or point to objective evidence supporting his assertion that Ms. Marshall could not work; and

- The TSA and labor market survey found sedentary positions in her area that were appropriate for her skill-set and paid wages comparable to those she had earned with BCBSD in 1984.

(*Id.*) At the close of the letter, the CAC described the final Claims Appeal procedure and specified an appeal deadline of June 4, 1999. (*Id.* at 000759.)

      E.      Ms. Marshall's Third Appeal

On May 18, 1999, Ms. Marshall again appealed the denial of her claim for LTD benefits. (*Id.* at 000866.) Marshall submitted additional medical records from Dr. Sommers and MRI/MRA results and requested an extension of time to submit additional medical evidence. (*Id.*) Ms. Grant acknowledged receipt of the additional records in a letter dated May 25, 1999, set an amended deadline of September 18, 1999 to complete her appeal, and explained that a decision would be made on her appeal within 60 days of that date. (*Id.* at 000864.) Ms. Marshall forwarded additional medical evidence to the Administrator on September 22, 1999. (*Id.* at 000849.) Grant acknowledged receipt of the records as of September 27, 1999 and stated that a decision would be made within 60 days. (*Id.* at 000846.)

As part of the appeal process, the Administrator obtained and reviewed additional treatment notes from Dr. Ufberg. (*Id.* at 000843-44, 000850-53.) On April 13, July 20 and October 21, 1999, Dr. Ufberg repeated his previous diagnoses, described the pain reports from Ms. Marshall in a similar way, and reiterated his conclusion that Ms. Marshall was totally disabled. (*Id.*) In the October 21, 1999 treatment note, Dr. Ufberg also noted that he had requested an MRI from Marshall that she told him was performed in August 1999. (*Id.* at 000843.) Dr. Ufberg said that the MRI was unavailable at that time, and later informed the Administrator that he did not receive the results of this MRI. (*Id.* at 000824.)

The Administrator also obtained and reviewed new records from Dr. Sommers. (*Id.* at 000863, 000867-68.) After requesting an MRI in his February 17, 1999 progress note, Dr.

Sommers noted in his April 30, 1999 progress note that an April 9, 1999 MRI of Marshall's brain and an MRI of her arteries revealed no significant abnormalities. (*Id.*) Dr. Sommers noted that Ms. Marshall described "little change with respect to her sensory symptoms" and that "[s]he [was] understandably quite frustrated." (*Id.* at 000863.) Dr. Sommers stated that "[a]t this point, I remain at a loss to definitively explain Mrs. Marshall's symptoms," and he therefore recommended she get a second opinion at an academic institution. (*Id.*)

The Administrator obtained and reviewed an August 4, 1999 letter from Dr. William Bank, an associate professor in the Department of Neurology at the University of Pennsylvania Medical Center. (*Id.* at 000854-55.) Dr. Bank noted that Marshall was able to care for herself, lived independently, and had no weakness in her arms or legs. (*Id.* at 000854.) He further noted that she could rise from a chair and walk without difficulty. (*Id.*) He concluded that Ms. Marshall's examination was normal, except for a subjective sensory level involving her right side, and that she should get an MRI of the cervical region for him to review. (*Id.*)

Nurse Jones subsequently contacted the offices of Drs. Bank, Sommers and Ufberg to determine whether the requested August 1999 MRI was actually performed. (*Id.* at 000824.) These conversations revealed that there was no evidence that Marshall had undergone the MRI per Dr. Bank's request. (*Id.*) However, the claim file contains an invoice sent to Ms. Marshall that suggests that she did, in fact, have an MRI on August 24, 1999. (*Id.* at 000698.)

Dr. Blonsky reviewed Ms. Marshall's medical records again on November 10, 1999 and concluded that she was not disabled and that no further investigation was required. (*Id.* at 000840.) He noted that the neurological findings continued to be "quite benign," the cervical MRI results were unchanged, the results of a brain MRI were normal, and there were no

objective findings to justify her symptoms or for considering her totally disabled. (*Id.*)

In a letter dated November 23, 1999 (the "November 1999 Letter"), Ms. Grant, in her capacity as Assistant Secretary of the NEBC, denied Marshall's final appeal for LTD benefits. (*Id.* at 000765-69.) In the letter, Grant recited relevant program provisions, discussed the case history and the documents reviewed as part of the appeal, and then noted the following:

- Ms. Marshall's claim was made primarily on her subjective complaints, which were not supported by objective evidence, and the file contained several instances, namely the 1996 FCE and Marshall's selective submission of evidence to the MRC, that led to the conclusion that Marshall did not want to return to work and had exaggerated her symptoms to facilitate that finding;

- The March 1998 physical therapy notes and records from Drs. Sommers and Bose all showed that Ms. Marshall was able to perform sedentary work and had been able to return to a number of life roles that had previously been limited;

- Ms. Marshall sought renewed care from Dr. Ufberg *after* her claim for benefits was denied and Dr. Ufberg's conclusion that she was unable to work was based only on Ms. Marshall's complaints of pain and her past surgeries;

- Dr. Blonsky, who has considerable expertise in the conditions claimed by Ms. Marshall, noted that her neurological exams and MRIs were normal and that Dr. Ufberg appeared to have no objective basis for his diagnoses

33

other than Ms. Marshall's past procedures and her subjective complaints
of pain; and

- Dr. Bank's examination of Ms. Marshall revealed normal results, other
  than her subjective complaints regarding her right side.

(*Id.*)

F.    Post-Exhaustion Communications Between Ms. Marshall and the Association

In September 2000, Ms. Marshall requested reconsideration of the decision to deny her appeals for LTD benefits. (*Id.* at 000735-38.) Ms. Grant responded on October 25, 2000, stating that Ms. Marshall had not provided any new or additional arguments and reiterating that the November 23, 1999 decision was final. (*Id.* at 000784.) Grant also reiterated that Ms. Marshall had exhausted all of her options under the Program. (*Id.*)

Marshall again sought extraordinary additional review of the denials of her claim and appeals on June 21 and August 22, 2001; in support of her requests, Ms. Marshall and her new counsel, Mr. John Stull, submitted a series of letters and additional medical documentation. (*Id.* at 000695, 000770-82.) The records submitted included a January 31, 2001 examination record from Dr. Steven D. Grossinger at the Swarthmore Neurology Association. (*Id.* at 000779-81.) Dr. Grossinger performed an EMG test on Ms. Marshall, and his examination report yielded the following impression: "[t]his is an abnormal study, indicating chronic left C6 radiculopathy." (*Id.* at 000779.)

In addition, in his August 22, 2001 letter, Mr. Stull indicated Ms. Marshall had been examined by Dr. Alan Belsberg [sic] of Johns Hopkins, and Mr. Stull requested that the Administrator consider his "early conclusions as to the existence of the Brown-Sequard Syndrom

34

[sic]. . . ." (*Id.* at 000695.) The records indicated that Ms. Marshall saw Dr. Allan Belzberg two times, on April 19 and May 31, 2000. (*Id.* at 000696, 000789-92.) In his April 19, 2000 treatment note, Dr. Belzberg stated that he had physically examined Ms. Marshall, but had not had the opportunity to review any MRIs of her cervical spine. (*Id.* at 000791.) At that time, Dr. Belzberg's assessments stated in relevant part: "[u]nfortunately, it appears that the second surgery [the October 1997 Surgery] resulted in a Brown-Sequard's type injury with upper motor neuron findings on the left and pink prick sensation loss on the right. Her current complaints are attributable to the Brown-Sequard's spinal cord injury." (*Id.*)

In his treatment note from the May 31, 2000 visit, Dr. Belzberg stated that he had reviewed Ms. Marshall's 1999 MRI, and he stated the following:

> [i]n summary, the patient has had two previous neck operations. She developed what appears to be Brown-Sequard-type syndrome after the second operation. That is common motor findings in her left upper and sensory findings on the right side. She does not have evidence of a spinal cord compression on the followup MRI examination and does not have any evidence of intrinsic cord changes on the MRI. At present, I do not feel the patient requires any further surgical intervention on her neck. I do not feel that her cervical pain would be improved with any further neck surgery. I have advised the patient to follow up with her original surgeon as required. I would be happy to evaluate the patient in the future should her symptoms or signs change.

(*Id.* at 000790.)

After reviewing the new records, Ms. Grant, on behalf of the Administrator, denied Ms Marshall's request for extraordinary review in a letter dated October 12, 2001; she noted that a further exhaustive review of Ms. Marshall's claim file was beyond the provisions of the Program documents and usual practices. (*Id.* at 000691-92.) Grant concluded that there was nothing in the new medical records that would justify a departure from normal procedures in this case. (*Id.*)

G.     Social Security Qualification by Ms. Marshall and Plan Offsets

As required by the Program, Ms. Marshall submitted requests for disability to the Social Security Administration. (*Id.* at 001165-66.) On March 20, 1988, she was granted disability status in the initial amount of $640 per month. (*Id.*) Ms. Marshall did not inform the Administrator of the award of Social Security benefits until December 1991 and therefore, pursuant to the terms of the Program documents, Ms. Marshall had to reimburse $31,077.53 in overpaid benefits to the administrator. (*Id.* at 00158-59; *see also id.* at 001160 (worksheet showing reduction in Ms. Marshall's monthly LTD benefits based on receipt of Social Security benefits).)

H.     The Present Action

On February 26, 2004, Ms. Marshall filed suit against the Defendants in the United States District Court for the District of New Jersey. (D.E. 21 at 2 (docket sheet for Case No. 04-cv-00945 (D.N.J. 2004)); D.E. 22 at 4-12.) Defendants moved to transfer the case to the Northern District of Illinois on September 7, 2004. (D.E. 21 at 4; D.E. 22 at 83-89.) Judge Joel A. Pisano of the District of New Jersey granted Defendants' motion on September 29, 2004 and the case was transferred to this Court. (D.E. 21 at 6; D.E. 22 at 193-94.)

Plaintiff brings this action pursuant to ERISA Section 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)). (D.E. 79 at 8.) Plaintiff seeks a judgment declaring her entitlement to benefits, interest on the delayed payment of benefits, and attorneys' fees. (*Id.* at 15-16.) Defendants seek a judgment that Ms. Marshall has failed to establish any entitlement to prospective LTD benefits. (D.E. 68.)

II. Summary

The basis behind the Court's ruling is set out at length herein, but a summary is likely appropriate. First, the parties spend a substantial portion of their briefs debating the applicable level of review concerning the Administrator's benefits denial: the Defendants argue for arbitrary-and-capricious review, whereas Ms. Marshall argues for *de novo* review. Resolution of this question implicated a number of tangled factual and legal questions, including at least some legal questions on which there is not substantial precedent and/or the parties have largely ignored in their briefing. After reviewing the briefs and the applicable caselaw, the Court has concluded that the most restrained step is simply to assume that Ms. Marshall is correct concerning the *de novo* level of review—as the parties have agreed to resolution of the case on the papers within the framework established by Fed. R. Civ. P. 52 and because Defendants are entitled to judgment even under the more plaintiff-friendly *de novo* standard of review.

As for substance, and as presaged immediately above, the Court finds that Defendants are entitled to judgment concerning the question of whether Ms. Marshall was properly denied further LTD benefits. In this regard, the Court has carefully reviewed the approximately 1400-page joint appendix/administrative record tendered by the parties, as well as related affidavits and materials. The record reflects some evidence that is helpful to each side. However, the weight of the evidence, including, in particular, the vast weight of evidence the Court finds credible in light of all the other evidence in the record, reflects that Defendants are entitled to prevail.

By way of further specificity, each party has one physician who most strongly supports its respective position. The Defendants have Dr. Blonsky, who became familiar with Ms. Marshall's records as a result of extended reviews over the years, and who clearly concluded that

37

Ms. Marshall was capable of returning to work and was likely malingering. Dr. Blonsky appears to have a long-term consultative relationship with the Program, however, raising potential bias concerns. Ms. Marshall, on the other hand, has Dr. Ufberg, whom Ms. Marshall seemingly sought out for a diagnosis—without even informing her attorney at the time—after Defendants determined that she had failed to establish any further entitlement to LTD benefits. The record reflects greater bias concerns, in the Court's view, for Dr. Ufberg than Dr. Blonsky: Plaintiff's own counsel suggested, when noting that he did not advise Ms. Marshall to seek his treatment/diagnosis, that Dr. Ufberg might be slanted towards plaintiffs in his diagnoses. (App. at 000955.) In addition, the tenor of Dr. Ufberg's write-ups seems, in light of all the other views expressed in the record, to indeed manifest such a bias, at least at some level.

Nonetheless, even if one equates Dr. Blonsky and Dr. Ufberg in terms of being subject to similar but competing biases (and that likely is overly generous to Plaintiff, in light of the witnesses' respective views as analyzed vis-a-vis the rest of the record in the case), the remaining evidence nonetheless reflects that judgment is warranted in favor of Defendants. Most notably, Plaintiff's own surgeon, Dr. Bose, found that she could resume all of her activities and cleared her for work. (*Id.* at 000746, 000892.) One of Plaintiff's other treating doctors, Dr. Kamsheh, also earlier cleared Ms. Marshall to return to work with modest restrictions that would not preclude her from gainful employment. (*See, e.g., id.* at 000085.) Plaintiff has attempted to cast doubt on the fairness and views of Dr. Kamsheh (*see id.* at 001122-23), but Ms. Marshall's criticisms of Dr. Kamsheh are unpersuasive. It seems clear that Ms. Marshall selected Dr. Kamsheh (at a minimum, there is no suggestion that the Program selected Dr. Kamsheh); moreover, no logical or sensible reason has been offered to suggest that Dr. Kamsheh would

38

disfavor the interests of his own patient in favor of her disability insurer.

The credibility of Ms. Marshall also is suspect, as she appears to have "sandbagged" on certain disability evaluation tests and also failed to report certain information that undermined her disability position. While the Court can assume that Ms. Marshall experiences some degree of pain and/or discomfort, the weight of evidence reflects that such pain and discomfort do not warrant a finding that she is prospectively disabled from engaging in productive employment. Ms. Marshall—at least when she actually completed her physical therapy sessions—appears to have made substantial gains and again gained the capacity to engage in various life-activities (including driving and participation in various church activities) and to be employed.

Thus, the Court sides with the weight of the evidence in the record, including the views of at least some of Plaintiff's own physicians, in finding that she cannot fairly be deemed to be disabled such that she should receive further LTD benefits. Such a conclusion warrants judgment in favor of Defendants, as explained further below.

III.    Standards of Review

As an initial matter, although Plaintiff filed her case initially in the District of New Jersey, and that court transferred the case to the Northern District of Illinois, precedent teaches that the court should apply the law of the Seventh Circuit. *See In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (Ginsburg, J.) ("The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit."); *accord, e.g., McMasters v. United States*, 260 F.3d 814, 819 (7th Cir. 2001) (citing

*In re Korean Air Lines, supra*); *In re Starlink Corn Prods. Liability Litig.*, 211 F. Supp. 2d 1060, 1063-64 (N.D. Ill. 2002) (Moran, J.).

Under ERISA, the judicial standard of review for benefit claims hinges on whether the plan administrator or fiduciary has been granted discretion in making the benefits determination. *See, e.g., Nickola v. CNA Group Life Assurance Co.*, No. 03 C 8559, 2005 WL 1910905, at *4 (N.D. Ill. Aug. 5, 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Decisions of ERISA plan administrators presumptively receive *de novo* review, but if the plan establishes discretionary authority, then review will be under the deferential arbitrary and capricious standard. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 980 (7th Cir. 2000) (citing *Firestone, supra*); *accord, e.g., Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003). Seventh Circuit precedent directs courts to look to the language of the plan to determine whether discretionary authority is granted, because "[i]f a plan 'is going to reserve a broad, unchanneled discretion to deny claims, plan participants should be told this, and told clearly.'" *Diaz v. Prudential Ins. Co. America*, 424 F.3d 635, 637 (7th Cir. 2005) (quoting *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 333 (7th Cir. 2000)) (internal punctuation omitted).

Turning to the application of the different standards, in discussing the presumptive *de novo* standard of review, the Seventh Circuit has held that *Firestone* "requires *de novo* review not only of benefit denials based upon an interpretation of a plan" but also "benefit denials based upon factual determinations." *Ramsey v. Hercules Inc.*, 77 F.3d 199, 202 (7th Cir. 1996) (discussing various appellate interpretations of *Firestone* and holding that the plaintiff was entitled to *de novo* review of the plan administrator's factual determination about her long-term

disability); *accord, e.g., Petrilli v. Dreschsel*, 910 F.2d 1441, 1446 (7th Cir. 1990) (stating in

dicta that *Firestone* "strongly suggests" that the Supreme Court intended the *de novo* standard of

review to be mandatory regardless of whether the denial of benefits under review involved plan

interpretation).[13]

---

[13] As stated above, the Seventh Circuit has held that, when *de novo* review applies in an ERISA case, it applies to factual determinations of the plan and/or administrator relating to benefits decisions. *See Ramsey v. Hercules Inc.*, 77 F.3d 199, 204 (7th Cir. 1996); *accord, e.g., Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249-51 (2d Cir. 1999) (adopting the majority position after canvassing the issue and determining that "[t]he Third, Fourth, and Seventh Circuits have ruled that the *de novo* standard applies to all issues arising when an ERISA claim denial is challenged under section 1132(a)(1)(B), including fact issues . . . .").

Questions follow concerning what is the proper scope of the *de novo* inquiry into factual determinations of eligibility–namely, what facts should the court review, and what procedural mechanisms should the district court employ? In this case, the Court need not address the question of what evidence to review, as the parties have each predicated their arguments on the materials in the Appendix, and neither has sought additional discovery (via Fed. R. Civ. P. 56(f) or otherwise) or sought to introduce any meaningful additional evidence. Thus, the Court proceeds to analyze the evidence jointly submitted by the parties. (The Court also notes that neither party has made any evidentiary objections to any of the materials in the Appendix/administrative record (*e.g.*, hearsay, authenticity, etc.) and so the Court considers any such objections waived.) As for the procedure to employ when engaging in *de novo* review, the Seventh Circuit's position appears to be that district courts may in the instant context proceed pursuant to Rule 52 (*see, e.g., Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)), or proceed under Rule 56, with the traditional summary judgment standard in place. *See, e.g., Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 540 (7th Cir. 2000); *accord Wolff v. Cont'l Cas. Co.*, No. 03 C 4667, 2004 WL 2191579, at *1 (N.D. Ill. Sept. 28, 2004) (Lefkow, J.).

The Court notes that its research revealed that the First Circuit has adopted a different procedural approach in these types of ERISA cases. The First Circuit in *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 516 (1st Cir. 2005), squarely addressed "[t]he overarching question . . . [of] what exactly is entailed in *de novo* review." In terms of procedure, *Orndorf* articulated a modified summary judgment standard to apply in *de novo* review of denial-of-benefits claims. In *Orndorf*, the parties filed cross-motions for summary judgment, and the district court granted summary judgment to the defendant insurer. In affirming this decision, the First Circuit stated that "[t]he review utilized by both this court and the district court in this ERISA case differs in one important respect from the review in an ordinary summary judgment case. As we noted in *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19 (1st Cir. 2003), in an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual

In situations where the arbitrary and capricious standard applies, determinations by the plan administrator will be overturned by the court only if they are "unreasonable, and not merely incorrect." *Herzberger*, 205 F.3d at 329. However, review under the deferential arbitrary and capricious standard is not a "rubber stamp" and courts should "not uphold a termination when there is an absence of reasoning in the record to support it." *Hackett*, 315 F.3d at 774-75 (citation omitted); *accord, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (concluding that the denial of an application for benefits was unreasonable where "[t]he record contain[ed] nothing more than scraps" to offset the plaintiff's evidence).

IV.     Discussion

     A.     The Court Will Assume That The *De Novo* Standard of Review Applies

     Both parties devote considerable portions of their briefs to the question of which standard of review the Court should apply to the question of Plaintiff's eligibility *vel non* for benefits. Unsurprisingly, Plaintiff argues for a *de novo* standard with respect to the Plan's denial, while Defendants assert that the Court's review should be limited to the deferential arbitrary and capricious standard of review. Issues relating to the standard of review include: whether the

---

inferences in its favor." *Id.* at 517 (other citations omitted). More specifically, the First Circuit expressly rejected the argument that "if the administrative record shows any conflict in views among the doctors, then summary judgment must be denied." *Id.* at 518. Although the First Circuit's summary judgment approach seems to be, with all respect, somewhat unconventional, the substance of the review to resolve factual determinations would appear in many (if not all) respects to be quite similar to a Rule 52 "trial on the papers" approach. Where parties have agreed, as they have in this case, to review based on a defined set of documentary/evidentiary materials, then whether a Rule 52 approach is employed, *see Hess*, or whether a modified "no inferences" summary judgment approach is used, *see Orndorf*, under either procedure, the court will be weighing evidence and making credibility decisions--and the presence of conflicting evidence will not bar the entry of judgment.

language of the Program Statement that was in effect as of 1995 was sufficient to grant discretion to the Administrator; whether the 1998 Amendment to the Program Statement, which would appear to grant discretion to the Administrator, was in effect at the time Plaintiff's claim accrued; whether the "Associations Agreement" between "Blue Cross Association and Blue Shield Association" and BCBSD should also be considered a "Program Document," such that its terms could grant discretion to the Administrator; and whether, even assuming that the 1998 Amendment was effective, or that the Associations Agreement was a Program Document and granted discretion, those grants of discretion could overcome the fact that the SPD did not clearly grant discretion.

The Court declines to take the extended foray required to resolve the questions relating to standard of review. Resolving the many interconnected issues and subissues is unnecessary, because under either standard of review, including the more claimant-friendly *de novo* standard, Defendants' decision to deny Plaintiff's LTD benefits must still be upheld. The Court concludes that, even applying the *de novo* standard, the evidence submitted by the parties weighs in favor of Defendants' decision and against a finding that Plaintiff was disabled for the purposes of the Program. Therefore, the Court will assume without deciding that the *de novo* standard applies. The Court notes that the burden of establishing disability remains with the Plaintiff, pursuant to the Program Statement and standard practice in civil cases. (*See* App. at 001278 (requiring the employee to submit medical evidence to the NEBC to establish disability).) *See generally Wernsing v. Dep't of Human Servs., State of Illinois*, 427 F.3d 466, 470 (7th Cir. 2005)

("[P]laintiffs bear the burden of persuasion in civil litigation . . . .").[14]

---

[14] As stated, the Court finds it unnecessary to resolve the question of whether discretion is conferred on the Administrator, or whether *de novo* review is the applicable standard. Definitively resolving that issue would require consideration of multiple arguable questions of fact and law, as explained below. (Instead, the Court assumes that the level-of-review debate is properly resolved in Ms. Marshall's favor.)

First, the relevant definition of "disabled" in the 1979 Program Statement, which was in effect from the time when Plaintiff was first awarded benefits until some time in 1998, appears to have been insufficient to confer discretion to the Administrator. Section 1(p) of the 1979 Program Statement stated that disabled "means that a Participant is, determined on the basis of medical evidence satisfactory to the Committee," disabled. (App. at 001278.) The Seventh Circuit has held that "the mere fact that a plan requires a determination of eligibility or entitlement by the administrator, or requires proof or satisfactory proof of the applicant's claim, or requires both a determination and proof (or satisfactory proof), does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000).

Second, although the 1998 Amendment altered the Program Statement's definition of "disabled" in a manner that appears to meet the Seventh Circuit's requirements for notice to the employee—*see* 1998 Amendment to Section 1(p), "[t]he determination as to whether a Participant is 'Disabled' shall be based on medical evidence satisfactory to the Committee in its sole discretion." (App. at 001302-03)—it is unclear whether this amendment was in effect when Plaintiff's claim accrued. The 1998 Amendment was either effective on July 2, 1998, when it was formally executed, or on March 11, 1998, which the 1998 Amendment states is its "effective date." (*See id.*) This timing matters, because Plaintiff's claim for benefits either accrued on July 21, 1998, the date of the letter that denied Plaintiff's benefits, or on June 30, 1998, the "effective date" provided in the denial letter. *See, e.g., Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003) (concluding that where the employer is at liberty to change the plan, "the controlling plan will be the plan that is in effect at the time a claim for benefits accrues" and that "a claim accrues at the time benefits are denied.") (internal quotation marks and citation omitted). The case law pinpointing more particularly what date should control appears to be relatively undeveloped, and the parties have not briefed the issue in any meaningful detail.

More importantly, even if the 1998 Amendment was in effect at the time Plaintiff's claim accrued, the language in the 1998 Amendment arguably conflicts with relevant language in the SPD. The SPD in effect stated that "LTD benefits are payable to you if you are found by the Program Administrator to be disabled (either physically or mentally) . . . . This determination is made on the basis of medical evidence submitted to the Program Administrator." (App. at 001354.) In such a "conflicting language" situation, caselaw suggests that where the claimant can show that she "relied to her detriment" on language in the SPD, then the SPD would control over the Program Statement. *See Schwartz v. Prudential Ins. Co. Of America*, 450 F.3d 697, 699 (7th Cir. 2006).

44

B.    Under *De Novo* Review, The Evidence Weighs In Favor of Denying Benefits

Precedent teaches that *de novo* review requires that the court look beyond the

reasonableness of the administrator's decision, and instead determine whether the administrator's

decision to deny benefits to the claimant was correct. *See, e.g., Akhtar,* 2002 WL 500544, at *5

(citing *Postma,* 223 F.3d at 540). To be eligible for benefits under the terms of the Program

Statement, the participant must satisfy the definition of "disabled" set forth in the Program

documents. As discussed above, the parties disagree about what version of Section 1(p) of the

Program Statement was in effect at the time Plaintiff's claim accrued. However, leaving aside

the question of language that may or may not permit deferential review by this Court, the relevant

language defining disability is not in question. The appropriate definition of disabled to apply to

Plaintiff's claim is that disabled "means that a Participant is, determined on the basis of medical

evidence satisfactory to the Committee, wholly prevented, by reason of mental or physical

disability, from engaging in any occupation comparable to that in which he was engaged for the

Employer, at the time his disability occurred,"—(App. at 001278)—and that "[a]n occupation is

Finally, Defendants argue that the language in the Associations Agreement conferred discretion on the Administrator. As an initial matter, it is unclear under the law whether the Associations Agreement should be considered by the Court to be a Program document for the purposes of the inquiry into discretion, in spite of the fact that the Program Statement expressly incorporates the Associations Agreement. (App. at 001283.) *See generally Sperandeo v. Lorillard Tobacco Co.,* — F.3d —, 2006 WL 2382459, at *4 (7th Cir. Aug. 18, 2006) (in an ERISA benefits case, discussing the threshold issue of what documents constitute the ERISA plan, and noting that "[i]n other cases, identification of the plan has presented difficult analytical questions. Indeed, we have remarked that confusion as to what constitutes 'the plan' for purposes of ERISA is all too common.") (internal quotation marks and citation omitted). Moreover, under *Herzberger,* it is also unclear whether the language in the Associations Agreement grants discretion clearly enough in any event. (*See* App. at 001310.)

The Court can, for purposes of the analysis, assume the resolution of all of these open questions in Plaintiff's favor; even if one assumes that *de novo* review is appropriate, judgment in favor of Defendants is warranted on the record presented.

considered comparable to that in which the Participant was engaged for the Employer if the earnings potential of the occupation is comparable to the employee's salary range at the time he became Disabled."[15] (*Id.* at 001289.)

As explained below, the Court concludes, after a thorough review of all of the materials provided by the parties, that Ms. Marshall is not disabled within the terms of the Program.

           1.      Ms. Marshall's Medical History And Current Condition

At the outset, the Court acknowledges that evidence supporting disability is not trivial or non-existent in this case. The Court acknowledges and credits evidence showing that Ms. Marshall has a history of diagnosed back and neck problems dating back to her auto accident in 1984. Subsequent to the auto accident, Ms. Marshall was found to be disabled by the Program in 1984. (*Id.* at 000523.) She underwent back surgery performed by Dr. Bose in 1990 (*id.* at 000295), but after the surgery she reported symptoms including low back pain, throbbing and spasms. (*Id.* at 000281.) In December 1991, Ms. Marshall's primary treating physician, Dr. Monteleone diagnosed her with "cervical and lumbar herniated nucleus pulposus" (specifically, Dr. Monteleone noted new findings of disc herniation at C4-5 with bulging at C3-4); at that time,

---

[15] Plaintiff argues that because the definition of "disabled" in the 1979 Program Statement, which was in effect when she first began to receive benefits, does not contain any requirement regarding salary comparability, the Administrator's labor market survey, which considered the availability of jobs at comparable salary levels, "is not creditable evidence of disability." (*See* D.E. 79 at 6.) However, Section 15(a) of the 1979 Program Statement clearly indicates that "[t]he Program may be amended at any time. . . ." (App. at 001284.) Caselaw teaches that in situations where the program language indicates that the employer is at liberty to change the plan, "the controlling plan must be the plan in effect at the time the benefits were denied." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003). Therefore, the Court concludes that the 1995 Amendment clearly governs Ms. Marshall's claim, and that evidence of comparable employment, including salary considerations, may be credited.

46

Dr. Monteleone described her as totally disabled from even a sedentary occupation and indicated that he did not expect a marked change in her condition in the future.  (*Id.* at 000281-82.)

Ms. Marshall's treatment by Dr. Monteleone continued until 1995, when he retired and Dr. Kamsheh became her treating physician.  (*Id.* at 000140.)  Dr. Kamsheh's treatment notes over the period of two years assessed Ms. Marshall as having bilateral carpal tunnel syndrome, chronic neck and arm pains, lumbar sprain and strain; he further noted that she had no weakness in her upper or lower extremities, was able to walk normally, and that her neurological exam was normal.  (*Id.* at 000055, 000140.)  A February 5, 1997 cervical MRI showed "[s]tatus post fusion from C5 to C7 with good alignment of the vertebral body.  Small herniation is noted at C3-4 with spondylosis and bulge at C4-C5."  (*Id.* at 000061.)  An April 30, 1997 lumbar MRI reviewed by Dr. Kamsheh showed "[d]isc dessication and central disc herniation at L5-S1, which is unchanged from previous study of 2/11/87.  No new disc herniations are identified.  There is no significant spinal stenosis or compression of neural elements."  (*Id.* at 000060.)

Once Dr. Kamsheh believed that he was unable to offer any kind of treatment for Ms. Marshall's symptoms, he referred her to her former surgeon, Dr. Bose.  (*Id.* at 000057.)  On May 13, 1997, Dr. Bose gave Ms. Marshall the option of continued conservative care, or a myelogram and possible surgery.  (*Id.* at 000058-59.)  Ms. Marshall declined to have a myelogram and surgery until September 1997, which was after the Administrator had denied her LTD benefits.  (*Id.* at 000002-08, 000795, 001120.)  The surgery was performed by Dr. Bose on October 28, 1997, and was a "two level anterior cervical discectomy, fusion with instrumentation," the discs involved were the C3-4 and C4-5 discs.  (*Id.* at 000892; *see also id.* at 000795.)

Dr. Bose examined Ms. Marshall multiple times post-surgery.  From January 1998 to

47

October 1998, Dr. Bose noted that x-rays showed that Ms. Marshall's disc fusion from the surgery was progressing well, that her alignment was satisfactory, and that her MRI results were normal. (*Id.* at 000745-50.) However, Dr. Bose noted that Ms. Marshall initially had some numbness in her left hand, and later, that Ms. Marshall was experiencing a burning sensation on her right side. (*Id.* at 000749, 000747.) Dr. Bose stated as of July 20, 1998, that she was experiencing good healing in her spine but "some of the sensations and aches and pains that she is having will be a residual part of her symptoms. It does not look like she will make a 100% recovery." (*Id.* at 000746.) (Dr. Bose, Ms. Marshall's surgeon, nonetheless released Ms. Marshall for sedentary work, despite her pain contentions, effective July 1998. (*Id.* at 000892; *accord, e.g., id.* at 000085 (Dr. Kamsheh, Ms. Marshall's principal treating doctor, releasing her to work with limited restrictions in April 1997).)) Dr. Bose's note of October 19, 1998 observed that her x-rays revealed solid fusion, but that she felt numbness from her neck down to her foot on her right side, and that her right foot felt like it was on fire. Dr. Bose observed some signs of "hemisensory spinal cord problems" and advised that Ms. Marshall continue to take Neurotonin for these sensory symptoms. (*Id.* at 000745.)

After her surgery, Ms. Marshall also was examined multiple times by another neurologist, Dr. William Sommers. In March 1998, Dr. Sommers noted that Ms. Marshall was experiencing weakness in her left upper extremity, in addition to sensory disturbance on the right side of her body. (*Id.* at 000756.) Dr. Sommers stated that he believed this pattern of sensation was suggestive of a cervical spinal cord syndrome, specifically Brown-Sequard Syndrome. (*Id.*) Dr. Sommers noted the same weakness and sensory disturbance symptoms in December 1998 and also noted that Neurotonin and Amitriptyline had somewhat relieved Ms. Marshall's symptom of

burning discomfort. (*Id.* at 000912.) At Dr. Sommers's direction, Ms. Marshall had an EMG in January 1999 that showed a mild degree of old damage to the C6 or C5 cervical rootlets, signs of carpal tunnel syndrome, and otherwise normal results. (*Id.* at 000883-84.) In April 1999, Dr. Sommers reviewed an MRI of Ms. Marshall's brain and an MRA of her arteries, and concluded that they revealed no significant abnormalities. (*Id.* at 000863.) At this time, Dr. Sommers noted that Ms. Marshall described little change with her sensory symptoms and stated that he was at a loss to definitively explain her complaints concerning these symptoms. (*Id.* at 000863.)

Dr. Sommers recommended that Ms. Marshall get a second opinion at an academic institution, and in August 1999, Ms. Marshall was examined by Dr. Bank of the University of Pennsylvania Medical Center. (*Id.* at 000854-55.) Dr. Bank noted that Ms. Marshall lived independently, was able to care for herself and had no weakness in her arms or legs. (*Id.* at 000854.) Dr. Bank concluded that Ms. Marshall's examination was normal, except for a subjective sensory level involving her right side. (*Id.*) Dr. Bank recommended that Ms. Marshall get a cervical MRI, but he did not apparently review any such MRI. (*Id.*)

Ms. Marshall began seeing Dr. Ufberg in September 1998—*after* her benefits were denied by the MRC in July 1998. (*Id.* at 000967-69.) The MRC had reinstated her benefits subsequent to the October 1997 Surgery. (*Id.* at 001078-80.) Ms. Marshall had previously been examined by Dr. Ufberg on March 15, 1991—or some seven years earlier. (*Id.* at 000212-17.) In the interim, Ms. Marshall had seen at least two doctors, Dr. Kamsheh (her principal treating physician) and Dr. Bose (her surgeon), who reached the conclusion that she could return to work. In his September 14, 1998 treatment notes, Dr. Ufberg stated that he believed that Ms. Marshall had left cervical myelopathy, a herniated disc at L5-S1, cervical, thoracic and lumbrosacral strain

49

and fibromyalgia. (*See, e.g., id.* at 000927.) Dr. Ufberg remained Ms. Marshall's treating physician in 1999, and he described her pain symptoms in a similar way and repeated his previous diagnoses. (*Id.* at 000843, 000850-53, 000921-22.)

Once Ms. Marshall's final appeal was denied, she underwent an examination by Dr. Steven Grossinger in January 31, 2001. (*Id.* at 000779-81.) Dr. Grossinger performed an EMG test, and he concluded that the EMG indicated chronic left C6 radiculopathy. (*Id.* at 000779.) Post-appeal, Ms. Marshall was also examined by Dr. Allan Belzberg of Johns Hopkins, who stated that her symptoms of left upper extremity weakness and pin-prick sensation loss on the right side were consistent with Brown-Sequard syndrome. (*Id.* at 000791-92.) Dr. Belzberg noted that Ms. Marshall's MRIs were normal. (*Id.* at 000790.)

In summary, the Court finds that Ms. Marshall has been experiencing a series of back and neck problems since her auto accident in 1984.[16] Moreover, since her October 1997 Surgery, Ms. Marshall has been examined by Drs. Bose, Sommers and Belzberg, who all report that she complains of left upper extremity weakness and sensory disturbances on her right side. Ms. Marshall consistently reports these symptoms–her treating physicians do not question that she is experiencing these symptoms, or that Neurotonin and other medications do not completely relieve the symptoms. In this regard, Drs. Sommers and Belzberg have suggested that her symptoms may be caused by an uncommon spinal cord condition, specifically the Brown-Sequard syndrome.

Recent objective tests, including MRIs of her spinal column, brain and arteries, and

---

[16] Plaintiff does not suggest that she is disabled on the basis of her diagnosed bilateral carpal tunnel syndrome.

50

EMGs have shown generally normal results, although they have confirmed that Ms. Marshall has a herniated disc at L5-S1 and some chronic damage to her neck.[17]

### 2. Ms. Marshall's Medical Conditions And Symptoms Are Not Disabling

#### a. Dr. Bose and Dr. Blonsky Released Ms. Marshall For Work

While the Court acknowledges Ms. Marshall's medical condition and symptoms and recognizes that the record contains at least some evidence that is favorable to both parties, it concludes that Ms. Marshall is not disabled under the terms of the Program. *See, e.g., Olson v. Comfort Sys. USA Short Term Disability Plan*, 407 F. Supp. 2d 995, 1012 (W.D. Wis. 2005) (Crabb, J.) (finding that the evidence warranted granting summary judgment for defendant employer on issue of employee's disability, despite the fact that there was "little doubt that plaintiff ha[d] substantiated her diagnosis of fibromyalgia."). In so finding, the Court credits the conclusion of Dr. Bose, one of Ms. Marshall's own treating physicians and the surgeon who

---

[17] At times Plaintiff appears to suggest that the Defendants have improperly rejected Ms. Marshall's claim to prospective LTD benefits simply because she has failed to adduce objective proof that she is suffering from pain. This is not a fair characterization of Defendants' actions. During the course of the case, Defendants certainly requested that Ms. Marshall identify and highlight any objective bases or corroboration of her subjective complaints of disabling pain. (*See, e.g.*, App. at 000007.) However, there is nothing illicit about trying to evaluate objective evidence, along with subjective evidence, in assessing whether one conclusion or the other is reasonable. Modern medicine generally tries to assess as much objective data as possible; indeed, many of the most significant medical advances of the past generation or two have concerned technology and diagnostic tools that make such data more readily available. Plaintiff cites no authority to suggest that Defendants' desire to assemble and assess such evidence (or lack thereof) is improper; indeed, failure to consider such evidence would likely be derelict, both in terms of fiduciary duty to the Program and to claimants generally. With regard to Plaintiff's contentions, what caselaw sometimes criticizes is a refusal to consider whether an outcome or disability claim is credible, simply because there is no objective evidence, where such objective evidence is not obtainable to corroborate certain problems. *See, e.g., Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Defendants did not make such a mistake: they looked at all the evidence in the record, including medical assessments from Ms. Marshall's own surgeon that she fairly could be released back to work. (*See, e.g.*, App. at 000892.)

performed the October 1997 Surgery, who released Ms. Marshall for work as of July 1998. The

Court also credits to a lesser degree the conclusion of Dr. Blonsky that Ms. Marshall was capable

of working in a sedentary occupation. There is other corroborating evidence as well. (*See, e.g.*,

App. at 000085 (Dr. Kamsheh releasing his patient to work with minimal restrictions in April

1997); *id.* at 000140 (Dr. Kamsheh stating in late 1996 that Ms. Marshall's "best option is to

increase her physical activity on a daily basis where she can enable herself to work and be

productive. I am not quite sure why she is not able to work at this point."); *id.* at 000144

(conclusion of evaluators that Ms. Marshall was not exerting maximum efforts during 1996

Functional Capacity Evaluation); *id.* at 000725 (August 1999 examination notes of Dr. Bank of

the University of Pennsylvania, who indicated that Ms. Marshall's "examination . . . [was]

normal, except for a subjective sensory level involving her right side.").

As stated above, the Court is persuaded by the fact that Dr. Bose released Ms. Marshall

for sedentary work as of July 1, 1998, with minor or no restrictions. (*Id.* at 000892.) Dr. Bose's

treatment note of July 20, 1998, after he released Ms. Marshall for work, is instructive. (*Id.* at

000746.) Having performed the October 1997 Surgery, examined Ms. Marshall frequently in the

following months, and having noted her possible spinal cord issues, Dr. Bose wrote that he

"informed her that some of the sensations and aches and pains that she is having will be a

residual part of her symptoms. It does not look like she will make a 100% recovery. However,

there is still time for healing. Return to office in three months. Gradually resume all activities.

Follow up x-rays in three months." (*Id.*) Dr. Bose's note acknowledges Ms. Marshall's sensory

disturbances and her aches and pains. He also directs her to monitor her condition and to

continue to seek medical treatment. However, his note strikes a balance between conceding that

52

Ms. Marshall does experience sometimes painful symptoms, and giving his professional opinion that her symptoms, and any medical condition causing the symptoms, should not prevent her from resuming all activities, including, as he previously noted, sedentary work.

The Court also credits, but to a lesser degree, the conclusion of Dr. Blonsky that Ms. Marshall could return to work.[18] Dr. Blonsky did not examine Ms. Marshall in person, but he did review her case file multiple times over a three-year span. Dr. Blonsky's professional credentials are impressive (*id.* at 00767); to be sure, he is a consultant for the Program, and so the Court must be aware of the possibility described by the Supreme Court in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), that Dr. Blonsky "may have an incentive to make a finding of 'not disabled' in order to save [his] employer[] money and to preserve [his] own consulting arrangements." *Id.* at 832 (internal quotation marks and citation omitted). In the present matter, however, the record reflects that Dr. Blonsky reached his opinion that Ms. Marshall is not disabled after thoroughly reviewing the reports of her treating physicians, medical test results, therapy reports and the results of the FCE and the labor market survey. Dr. Blonsky chose to credit certain evidence (*e.g.*, Dr. Kamsheh's and Dr. Bose's findings, the generally normal MRI and EMG test results), and to reject other evidence (*e.g.*, Dr. Ufberg's findings, the abnormally low performance results on the FCE, Ms. Marshall's subjective belief that she was incapable of

---

[18] At the outset, the Court rejects any suggestion that an ERISA regulation made it procedurally improper to have Dr. Blonsky review Ms. Marshall's claim at both the benefit determination stage, and the appeal stages. Plaintiff notes that "[t]he ERISA claims regulations provide that the health care professional who consults after appeal may not have been consulted during the claimant's adverse health benefit determination." (D.E. 79 at 9 n.2 (citing 29 C.F.R. § 2560.503-1(h)(3)(ii).) The Court does not find it necessary to conclude whether this regulation would have barred Dr. Blonsky from participating in the appeal process, because, as Plaintiff notes in her statement of facts, "this regulation only went into effect on January 1, 2002." (D.E. 77 at 22 n.16.)

working). Although the Court finds that Dr. Blonsky may have expressed some of his opinions in harsh language, the Court finds no sign that Dr. Blonsky did not reach a legitimate medical conclusion after careful review of the available evidence. Therefore, the Court concludes that Dr. Blonsky's opinion that Ms. Marshall could return to work is entitled to some weight.[19]

Moreover, to the extent one naturally tends to review the opinions of an insurer's long-time consultant (particularly in the *de novo* review setting) with a concern for bias or slant, the same is true to at least as great an extent with respect to Plaintiff's strongest disability advocate, Dr. Ufberg. Not surprisingly, ERISA precedent reflects that a Plaintiff's own treating or selected physician may tend to be biased at the margins towards his or her own patient, the plaintiff. *See Nord*, 538 U.S. at 832 ("And if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so [too] a treating physician, in a close case, may favor a finding of 'disabled.'"). This generic concern about Dr. Ufberg takes on heightened significance in the instant case, where the record reflects that Mr. Goll, Ms. Marshall's attorney at the time, described Dr. Ufberg as having a "bias toward plaintiffs" and explained that he did not suggest that Ms. Marshall see Dr. Ufberg. (App. at 000955.) In addition, as will be discussed further below, the possibility of bias grows stronger when one considers his nearly-identical statements describing Ms. Marshall's limitations and disabled condition that appear in the treatments reports of 1991 and 1998–Dr. Ufberg's cookie-cutter report of 1998 failed to account in any way for the

---

[19] Although not material to the bottom-line conclusion in the case, the Court notes that Dr. Blonsky also apparently has been a witness for multiple plaintiffs seeking disability benefits in other cases (*see* D.E. 81 at 9 (discussing cases)), which suggests that he is not reflexively committed to one perspective in this area. Again, Dr. Blonsky appears to be a very well-credential physician (he is on faculty at Northwestern, for example) and his views, while unfavorable to Ms. Marshall, are credible.

major changes in Ms. Marshall's condition that had occurred in the intervening seven years. (*Compare id.* at 000216, *with id.* at 000954.) Moreover, it is difficult to read the entire record, and to try to assess the credibility of the various medical positions in light of all of the others and the full record in the case, without coming to the conclusion that Dr. Ufberg indeed did have a bias in favor of a disability finding. Furthermore, and as explained elsewhere, even if one entirely discounts Dr. Blonsky and Dr. Ufberg because of potential bias concerns (and to be clear, that likely is a step that gives Ms. Marshall the substantial benefit of the doubt concerning the effects of any bias, given the full record in the case), the weight of the remaining evidence—including findings from Ms. Marshall's own treaters (*e.g.*, Drs. Kamsheh and Bose) that she should be able to return to work—favors a judgment in favor of the Defendants.

        b.       Other Physicians Did Not Indicate That Ms. Marshall Was Disabled

Subsequent to her October 1997 Surgery, Ms. Marshall has seen and been treated, or has had her case file reviewed by, Drs. Ufberg, Bank, Sommers, Grossinger and Belzberg. With the exception of Dr. Ufberg, none of those physicians stated that Ms. Marshall was disabled. The doctors who examined Ms. Marshall noted similar symptoms and also noted that tests such as MRIs and EMGs failed to provide an objective explanation or corroboration for the symptoms. Dr. Belzberg has advanced the opinion that Ms. Marshall's symptoms may indicate that she has been experiencing Brown Sequard syndrome following her October 1997 Surgery. (App. at 000791.) Dr. Sommers mentioned this syndrome once in his early treatment notes, but did not discuss it again. (*Id.* at 000756.) While the Court acknowledges the opinion of Dr. Belzberg, his diagnosis of Brown-Sequard syndrome, standing alone, does not strongly weigh in favor of a

finding of disability. Dr. Belzberg does not recommend further surgery or any particular treatment, nor does he indicate that Ms. Marshall is incapable of working. The Court views Dr. Belzberg's opinion that Ms. Marshall may have Brown-Sequard Syndrome as identifying a potential cause for Ms. Marshall's symptoms—but the fact that one physician gave a name to Ms. Marshall's condition does not conflict with the conclusion of Dr. Bose (*i.e.*, Ms. Marshall's own surgeon) or Dr. Kamsheh (*i.e.*, Ms. Marshall's own selected treating physician at the time) that Ms. Marshall was capable of working in spite of her symptoms. Nor (as will be discussed below) does Dr. Belzberg's statement conflict with the evidence that Ms. Marshall participated in physical and occupational therapy and showed great physical improvement and improved ability to undertake daily activities.

c. The Court Does Not Credit Dr. Ufberg's Opinion

The Court does not credit the conclusion of Dr. Ufberg that Ms. Marshall is disabled. Although the Court is not required to give special weight to a treating physician's opinion, *see Nord*, 538 U.S. at 834, the Court should not arbitrarily refuse to give it consideration. *See, e.g., Nickola*, 2005 WL 1910905, at *12. In the present matter, the Court has found reliable evidence that conflicts with Dr. Ufberg's evaluation: Dr. Bose has released Ms. Marshall for work; Dr. Kamsheh did the same and Dr. Blonsky pointedly rejected any notion that Ms. Marshall was disabled; and none of the other physicians who have examined Ms. Marshall has indicated that she cannot work. Beyond the fact that Dr. Ufberg's opinion directly contradicts with those of others, including Dr. Bose (Ms. Marshall's surgeon), there are multiple reasons why the Court is persuaded to give less weight to Dr. Ufberg's opinion.

First, while Dr. Ufberg diagnoses Ms. Marshall as having fibromyalgia, his examination

56

reports do not provide a meaningful foundation for that diagnosis. Dr. Ufberg records various

symptoms reported by Ms. Marshall—including burning over Ms. Marshall's right leg and arm

and decreased sensation, or an uncomfortable feeling, over her right trunk; balance problems;

difficulty with dropping things; and pain at night. (App. at 000921-28.) Although the parties

have not provided a description of fibromyalgia, numerous courts in this circuit have discussed

the condition. The Court takes notice of the Seventh Circuit's description of the condition in

*Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996):

> a common, but elusive and mysterious, disease, much like chronic fatigue
> syndrome, with which it shares a number of features. Its cause or causes are
> unknown, there is no cure, and, of greatest importance to disability law, its
> symptoms are entirely subjective. There are no laboratory tests for the presence or
> severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue,
> disturbed sleep, stiffness and–the only symptom that discriminates between it and
> other diseases of a rheumatic character–multiple tender spots, more precisely, 18
> fixed locations on the body . . . that when pressed firmly cause the patient to
> flinch.

*Id.* at 306. Dr. Ufberg's description of Ms. Marshall's symptoms do not readily match with the

above-described symptoms of fibromyalgia. (*See* App. at 000921-28.) Moreover, Dr. Ufberg's

notes do not indicate that he performed any testing that would confirm the presence of tenderness

at the 18 fixed locations; indeed, his examination notes do not suggest that he performed a

muscle examination. (*Compare id.* at 000215 (Dr. Ufberg's examination notes of Ms. Marshall

from March 28, 1991, where he performed a muscle examination that indicated the presence of

tenderness), *with id.* at 000921-28 (Dr. Ufberg's treatment notes from 1998-99, where no muscle

examination notes were recorded).)

    Second, the history between Ms. Marshall and Dr. Ufberg as doctor and patient lead the

Court to assign little weight to his current conclusions about her ability to work. Ms. Marshall

sought Dr. Ufberg out after her benefits were denied on appeal in July 1998 (and after Dr. Bose, her surgeon, had released her for work). (*Id.* at 000972-74.) This was not the first time Dr. Ufberg had seen Ms. Marshall. In 1991, Dr. Ufberg examined Ms. Marshall and concluded that she was unable to return to work. (*Id.* at 000216.) He described her limitations in the following way:

> Ms. Marshall is markedly restricted in terms of her physical activities. Her sitting would be limited to less than one hour at a time and standing limited to 20-30 minutes at a time. In an eight hour day, she would only be capable of sitting three to four hours at a time or standing approximately one hour to an hour and a half. She is totally restricted from any type of bending activities. Lifting would be restricted to five to ten pounds maximum. She is also restricted from any overhead activities using her arms. With these restrictions in addition to problems with flare-ups in her pain symptoms, it is my opinion that Ms. Marshall is incapable of returning to work.

(*Id.*) Fast-forward to November 23, 1998—or seven years later—and Dr. Ufberg reaches exactly the same conclusion, using exactly the same language. (*Compare id., with id.* at 000954.) Dr. Ufberg's word-for-word reiteration of his earlier statement of the nature of Ms. Marshall's disability is entitled to substantial skepticism, given that in the intervening seven years, Ms. Marshall had undergone a significant surgery, and other doctors and therapists had noted major changes in her condition. (Indeed, during this period, two of her own doctors had deemed her fit to return to work.) Moreover, Ms. Marshall's return to Dr. Ufberg after so many years, in light of his prior conclusion, suggests that she was seeking him out less for medical expertise and more for his willingness to offer the medical opinion that she was disabled.[20]

---

[20] In this regard, the Court notes that the record reflects that Ms. Marshall seemingly is very aware of the impact that her interactions with physicians will/may have on her litigation positions. Thus, for example, as early as 1987, Ms. Marshall was discussing with a physician, Dr. Martin Gibbs, whether Dr. Gibbs should simply treat her as a patient, or should treat Ms. Marshall with a view to her litigation positions. (*See* App. at 000409-10 (Dr. Gibbs's notation

Finally, the restrictions that Dr. Ufberg describes, that he maintains render Ms. Marshall incapable of working, belie the flat conclusion that she is incapable of sedentary work. As related above, Dr. Ufberg's description of Ms. Marshall's limitations is not inconsistent with her working a sedentary job that permits her to stand and take a short breaks every hour or so. (*Id.* at 000954.) In addition, the restrictions related to bending, lifting and overhead activities are consistent with this Court's understanding of most sedentary occupations. Finally, Ms. Marshall has been managing the pain flare-ups that Dr. Ufberg describes with Neurotonin, Advil and Tylenol and Flexeril during the day, and a narcotic (either Darvocet, Elavil or Pamelor) every other night. (*Id.* at 000921, 000923, 000926.) This regime of medication does not, by Ms. Marshall's description or by the indication of any of her physicians, lead to drug-related incapacity during the day, in contrast to situations where an individual's dependence on narcotics can itself leave the individual unable to work.

> d.    Evidence Of Ms. Marshall's Functional Ability Supports A
>        Finding That She Is Not Disabled

The Court further credits evidence that demonstrates that, following the October 1997 Surgery, Ms. Marshall's condition improved with physical and occupational therapy, and she was able to engage in more life activities. Specifically, the final note (March 18, 1998) from Ms. Marshall's occupational therapy sessions at the OTD indicated that Ms. Marshall was attempting more functional activities, including housekeeping and laundry, she had resumed driving, she had become more active in her church, her pain had decreased, and therefore, no further occupational therapy was needed. (*Id.* at 001016-18; *see also id.* at 001017 ("Pain reduced to manageable

that, "the patient [*i.e.*, Ms. Marshall] understands and agrees that I will not become involved in her litigation. There is an ample number of other doctors involved for that purpose.").)

level from having been major limiting factor to [patient] performing activities. . . . Has consequently resumed many life roles that were previously limited by constant pain/depression.").)

Caselaw cautions against assuming that evidence that shows that a claimant has the "ability to do some activities at home by itself shows that a claimant can perform the material duties of her job." *Hillock v. Cont'l Cas. Co.*, No. 02 C 5126, 2004 WL 434217, at *6 (N.D. Ill. Mar. 2, 2004) (Nordberg, J.)[21]; *see also Hawkins*, 326 F.3d at 918 (concluding that where the claimant's "unfortunate choice in life is between succumbing to his pain and fatigue and becoming inert, on the one hand, and on the other hand pushing himself to engage in a certain amount of painful and fatiguing activity," that "[i]f he does the latter, it does not prove that he is not disabled."). However, this caselaw in no way suggests that evidence relating to a claimant's functional ability and activity level is irrelevant to the disability analysis. Here, the evidence suggests that after surgery and with occupational therapy and medication, Ms. Marshall's pain had reached manageable levels such that she could "resume many life roles." While this activities-related evidence from Ms. Marshall's occupational therapy sessions does not prove that Ms. Marshall is not disabled, it supports the findings of Dr. Bose that Ms. Marshall could resume all activities, including sedentary work. It is noteworthy that the evidence that Ms. Marshall can

---

[21] The facts of *Hillock v. Cont'l Cas. Co.*, No. 02 C 5126, 2004 WL 434217 (N.D. Ill. Mar. 2, 2004) are materially different from those in the instant case. In *Hillock*, the insurer/plan "completely ignore[d] the objective medical evidence," "ignore[d] the opinion of Hillock's [plaintiff's] own doctors," and failed to hire a doctor of its own to review the evidence. *Id.* at *5. In the instant case, Ms. Marshall's own physicians have generally cleared her to return to sedentary employment, there is little if any objective corroboration or evidence of any disabling condition, and the plan hired its own doctor, who definitively rejected any idea that Ms. Marshall is disabled.

engage in daily life activities is consistent with the conclusion of Dr. Bose, because this consistency distinguishes the present matter from cases cited by Plaintiff, such as *Hawkins*, where the treating physician concluded that the claimant was disabled, and the contradictory activities-related evidence was merely an "activities questionnaire" filled out by the claimant. *See, e.g., id.* at 916-918; *see also id.* at 919 (noting that the record contained "nothing more than scraps to offset the evidence presented by . . . [the claimant] and by . . . [his treating physician].").

> ### e.  Ms. Marshall's Credibility Regarding Her Inability to Work Is Suspect

In weighing Ms. Marshall's belief that her symptoms leave her disabled, the Court finds that her opinion is less than credible. In this regard, the Court relies on evidence from the FCE evaluators that Ms. Marshall did not put forth maximal effort on the FCE, that her perceived level of capability was lower than her actual level, and that her scores on some tests were lower than her claimed condition could possibly cause. (App. at 000031-38; *accord, e.g., id.* at 000034-35 (Ms. Marshall scored below the first percentile at placing checker-sized objects with speed and accuracy, and on another test, claimed that she did not understand the mechanism for threading screws).) Dr. Blonsky was strongly influenced by the results of the FCE in his opinion that Ms. Marshall was not disabled, and believed that the test suggested that she was "manipulative and probably malingering." (*Id.* at 000094.) In this regard, the Court specifically finds incredible Ms. Marshall's contention during the FCE that she could not understand the mechanism for threading a screw. *See generally Kobs v. United Wisconsin Ins. Co.* 400 F.3d 1036, 1039-40 (7th Cir. 2005) (discussing negative credibility impact of evidence suggesting that

plaintiff was "sandbagging" when, during disability evaluation tests, plaintiff scored in a manner that would reflect an IQ of 80 and performed in a manner that would be poor, "even for people who are mentally retarded," when such performance was not otherwise expected). The record in this case, which includes many handwritten and persuasively drafted letters and notes by Ms. Marshall, makes clear that Ms. Marshall is a very smart woman who can communicate well and who fully understands her litigation and case. The idea that she cannot understand the mechanism for inserting a screw—a task that literally is part of playboards assembled for toddlers—makes it difficult, with all respect, to resist the conclusion that Ms. Marshall also engaged in some intentional underperformance or "sandbagging" of her own.

In this vein, it also appears that Ms. Marshall did not submit evidence to the MRC that was unfavorable to her claim. (App. at 001026 (notes from Nurse Jones indicating that when she requested some of Ms. Marshall's records from Dr. Bose and the occupational therapists at OTD, "Dr. Bose + the O.T. say they gave Denise the records requested already."); *see also id.* at 000994.) Along these lines, there are suggestions in the record that Ms. Marshall inaccurately represented to Nurse Jones that Dr. Bose was unwilling to perform surgery on her until her pain was unbearable. (*Id.* at 000067.) Moreover, Ms. Marshall's decision to return to Dr. Ufberg for a disability opinion, after not seeing him for seven years, and only after her appeal had been denied, is suspect. (Ms. Marshall's decision to seek treatment from Dr. Ufberg after her appeal was denied, seemingly without even consulting or notifying her attorney, also suggests a degree of calculation that, while not negative, generally corroborates the idea that she is consciously monitoring the source and content of information she is providing the Program.) Finally, on the general topic of Ms. Marshall's credibility, the Court does not rely on, but does take note of the

fact that Ms. Marshall did not disclose to the Program that she had been awarded Social Security benefits for her disability until three years after the award, which resulted in substantial overpayment. (*Id.* at 001156.)

In noting the following problems with Ms. Marshall's credibility, the Court does not question that Ms. Marshall experiences uncomfortable and painful symptoms. But Ms. Marshall's actions in the course of the review of her claim, in particular her inexplicably and suspiciously poor results on the FCE, call into doubt her conclusion that her symptoms leave her incapable of working at a sedentary occupation. *Accord, e.g., Kobs*, 400 F.3d at 1039-40 (affirming defendant plan's denial of disability benefits where the medical evidence included results which suggested that the plaintiff was "sandbagging during the tests.").

The Court pauses to address Plaintiff's argument that the case law supports her position that her pain is disabling. (*See, e.g.*, D.E. 79 at 11 (citing *Hawkins*, 326 F.3d 914 and *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004).) Seventh Circuit precedent admittedly teaches that "in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Carradine*, 360 F.3d at 753 (internal quotation marks and citation omitted). However, precedent also teaches that situations where the claimant's symptoms are not supported by objective medical evidence may present an opportunity for "the unscrupulous applicant to exaggerate his or her pain without fear of being contradicted by medical evidence," and that the disability evaluator "must be alert to this possibility and evaluate the applicant's credibility with great care." *Id.*

In the present matter, the Court concludes that Ms. Marshall's credibility problems call into question her subjective reports of how disabling her pain is. Moreover, although Ms.

63

Marshall's efforts to obtain relief are well-documented and long-standing, these efforts are markedly less extreme than the efforts that Judge Posner found in *Carradine* to reinforce the credibility of the plaintiff's subjective claim of disabling pain. *See id.* at 755 (concluding that the credibility of the Social Security claimant's subjective claim of severe, disabling pain was reinforced because of the "improbability that . . . [the claimant] would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator . . . ."). The Court is not disregarding Ms. Marshall's subjective reports of pain, nor is the Court unsympathetic to her discomfort. Yet, the Court is charged with making a credibility assessment, in light of all the evidence in the record, about whether Ms. Marshall is permanently "disabled" such that she should receive LTD benefits because she cannot engage in sedentary employment. Put differently, the Court is not simply trying to determine whether Ms. Marshall is experiencing some level of pain or is entirely pain-free. The Court does not find that Ms. Marshall's reports of her symptoms and her pain establish that she is incapable of performing sedentary work. *See, e.g., Spangberg v. The Pepsi Bottling Group Long Term Disability Plan*, No. 05-C-703-C, 2006 WL 1529659, at *12 (W.D. Wis. May 30, 2006) (Crabb, J.) (concluding, on *de novo* review, that "[t]he record contains adequate support by a preponderance of the evidence for the plan's conclusion that plaintiff did not provide evidence sufficient to show that he was unable to engage in any reasonable occupation."). In reaching this conclusion, the Court sides with the weight of the evidence in the record, including assessments of Dr. Kamsheh and Dr. Bose, two of Ms. Marshall's own treaters/surgeons, that she is capable of sedentary work.

64

f.    The Administrator Used Acceptable Salary Numbers in Performing
     The Search For Comparable Occupations Pursuant To The Terms
     Of The Program

The Court also notes that the results of the TSA and the labor market survey conducted by

Ellis and Associates show that there are sedentary occupations in her area that Ms. Marshall 1) is

qualified for and 2) can engage in for roughly the same salary she was receiving when she

stopped working in 1984. (*Compare* App. at 000881 (information provided by the Administrator

to Ellis and Associates indicating that Ms. Marshall's monthly salary level when she stopped

working in 1984 was $1693 per month) *with id.* at 000897 (labor market survey indicating that

eight sedentary positions were found in the $6-12 per hour range, which equates to between

$1056 and $2112 per month, using the assumptions of an eight hour work day and 22 working

days per month).)

Ms. Marshall argues that "[t]o analyze comparability of jobs using 2002 salary levels

when Marshall's job at the time she left active employment was 20 years ago is a flawed

standard." (D.E. 79 at 6.) The relevant language in the 1995 Amendment states that "[a]n

occupation is considered comparable to that in which the Participant was engaged for the

Employer if the earnings potential of the occupation is comparable to the employee's salary range

at the time he became Disabled." (App. at 001289.) The Court concludes that the

Administrator's interpretation of the contract language is a reasonable one, namely, that a

comparable occupation will have a salary that falls within the salary range of the employee's

former job. Ms. Marshall does not set forth another interpretation of the language in the Program

Statement, nor does she proffer any evidence that the salary range available (which at the high

end is over $400/month higher than her prior salary) is not fairly analogous. Therefore, the

65

results of the TSA and the labor market survey with salary component also support a finding that Ms. Marshall is not disabled under the terms of the Program.

g.      The Court Is Not Required To Defer To The Social Security
        Administration's Determination of Disability

Although the Court takes note of the fact that Ms. Marshall was found to be disabled by the Social Security Administration ("SSA"), precedent teaches that in making a disability determination pursuant to an ERISA plan, the Court is not required to defer to the findings of the SSA. *See generally Nord*, 538 U.S. at 832 (distinguishing disability determinations by the SSA because they are measured against a "uniform set of federal criteria," from ERISA disability determinations that turn on "interpretation of terms in the plan at issue.") (internal quotation marks and citation omitted). Ms. Marshall argues that the Administrator "did not seek to review the medicals used to decide Marshall's SSDI status." (D.E. 79 at 11.) However, Ms. Marshall did not provide any Social Security medical records or findings to the Administrator, nor to this Court. Nor did Ms. Marshall provide any guidance regarding the standard that was used in determining her qualification for Social Security benefits. Therefore, Plaintiff cannot, with all respect, persuasively argue that the absent information should have dictated a different outcome. Given the *exhaustive* review that Ms. Marshall's claim was given by the Administrator, and given the reams of medical evidence that were reviewed, the Court does not find that the Social Security determination weighs strongly in favor of a determination of disability for the purposes of the Program. *See, e.g., Quinn v. The Non-Contributory Nat'l Long Term Disability Program*, 113 F. Supp. 2d 1216, 1222-23 (N.D. Ill. 2000) (Shadur, J.) (concluding that it was not an abuse of discretion for the defendant Blue Cross to fail to give weight to the finding of disability

66

reached by the SSA).

> h. The Fact Ms. Marshall Was Previously Found Disabled Does Not Outweigh The Evidence Of Her Improved Condition And Her Ability to Work Now

This Court has previously stated its view that the fact that a claimant was previously found disabled at the time her benefits were denied must fairly be considered in evaluating the propriety of the prospective benefits assessment at issue. *See Nickola*, 2005 WL 1910905, at \*8 (noting that where the insurer had determined that the plaintiff was entitled to LTD benefits "'the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to terminate those payments.'") (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)). Ms. Marshall's benefits were awarded in 1984, suspended prior to her October 1997 Surgery and then reinstated, and then finally denied in July 1998. The Court initially was somewhat skeptical of the timing of the assault on Ms. Marshall's disability status; the Court was concerned that the institution of the Nurse Case Manager program and cost-related concerns might be driving a reversal of position. In this regard, it is at least possible that the Court would have concluded that a denial of Ms. Marshall's benefits based on her condition before the October 1997 Surgery would have been unjustified—although, after reviewing the record, it seems as though Ms. Marshall's disability case always was rather marginal, and that a prior denial may well have been justified, particularly under any arbitrary-and-capricious review. There is significant evidence, however, of improvement in Ms. Marshall's condition subsequent to the October 1997 Surgery. In the instant case, the improvement noted by Ms. Marshall's physicians, therapists, and by Ms. Marshall herself, overcomes any initial skepticism concerning the Program's change of position.

67

In conclusion, the Court acknowledges that Ms. Marshall's subjective symptoms include pain and unpleasant sensory experiences and that her physicians suggest that she will never likely return to the physical condition she enjoyed in the mid 1980s. However, the substantial weight of the evidence suggests that Ms. Marshall's symptoms do not render her disabled under the terms of the Program. Therefore, the Court enters judgment in favor of Defendants.

V.     Conclusion

For the reasons set forth above, the Court enters judgment in favor of Defendants. The cross-motions for summary judgment, having ultimately been the vehicles by which the parties' positions were presented within the context of a Rule 52 disposition, are respectfully dismissed as moot.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: _September 13, 2006_